Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

# UNITED STATES DISTRICT COURT

for the

District of Columbia

Division

|   |   |
|---|---|
| Danielle Shapiro, M.D. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

-v-

Howard University and Hospital

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

Case: 1:18−cv−02588   jury demand
Assigned To : Unassigned
Assign. Date : 11/9/2018
Description: Employ. Discrim. (H−DECK)

Jury Trial: *(check one)*   X   Yes        No

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

I.      **The Parties to This Complaint**

A.      **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if
needed.

|   |   |
|---|---|
| Name | Danielle Shapiro |
| Street Address | 2727 Central Avenue NE |
| City and County | Washington |
| State and Zip Code | DC, 20018 |
| Telephone Number | 240-671-4828 |
| E-mail Address | danielle.r.shapiro@gmail.com |

RECEIVED

NOV − 9 2018

**B.     The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Howard University Office of General Counsel |
| Job or Title *(if known)* | |
| Street Address | 2400 Sixth Street, NW, Suite 321 |
| City and County | Washington |
| State and Zip Code | DC 20059 |
| Telephone Number | 202-806-2650 |
| E-mail Address *(if known)* | ariana.arnold@Howard.edu |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Pro Se 7 (Rev 12/16) Complaint for Employment Discrimination

Defendant No. 4

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

**C.**　　**Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | Howard University Hospital |
| Street Address | 2041 Georgia Ave NW |
| City and County | Washington |
| State and Zip Code | DC 20059 |
| Telephone Number | 202-865-1452 (dept) |

**II.**　**Basis for Jurisdiction**

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

X　　　　Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

    *(Note:  In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

    *(Note:  In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

X　　　　Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note:  In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

Other federal law *(specify the federal law)*:

Section 11(c) of the Occupational Safety & Health Act (OSHA). [29 U.S.C. §660(c)] , 29 CFR 1977 et seq.

Relevant state law *(specify, if known)*:

Relevant city or county law *(specify, if known)*:

## III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

Please see attached STATEMENT OF FACTS AND STATEMENT OF CLAIM
Please also see attached copy of Declaration submitted with EEOC Charge No.: 570-2017-01490 on June 1, 2017.

A.    The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

Failure to hire me.

X    Termination of my employment.

X    Failure to promote me.

X    Failure to accommodate my disability.

X    Unequal terms and conditions of my employment.

X    Retaliation.

Other acts *(specify)*:    singling out and differential treatment, breach of contract, harassment, open hostility, conspiring to defame/poison personnel and public records, fabrication of records, violation of privacy, violation of whistleblower protections, this list is not exhaustive

*(Note:  Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.   It is my best recollection that the alleged discriminatory acts occurred on date(s)

please see Statement of Claim. please also see attached copy of Declaration submitted with EEOC Charge No.: 570-2017-01490 on June 1, 2017. (course of employment was July 2016-May 2017)

C.   I believe that defendant(s) *(check one)*:

X    is/are still committing these acts against me.

is/are not still committing these acts against me.

D.   Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

race                          X

color

gender/sex                    X

religion                      X

national origin               X

age *(year of birth)*                    *(only when asserting a claim of age discrimination.)*

disability or perceived disability *(specify disability)*

X (autoimmune condition)

E.   The facts of my case are as follows.  Attach additional pages if needed.

please see Statement of Claim. please also see attached copy of Declaration submitted with EEOC Charge No.: 570-2017-01490 on June 1, 2017.

*(Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV.   Exhaustion of Federal Administrative Remedies

A.   It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

charge filed with EEOC Washington Field Office on June 1, 2017

B.        The Equal Employment Opportunity Commission *(check one)*:

                        has not issued a Notice of Right to Sue letter.

            X           issued a Notice of Right to Sue letter, which I received on *(date)*        August 16, 2018
                                                                                                    (see attached
                                                                                                    Notice)

                        *(Note:  Attach a copy of the Notice of Right to Sue letter from the Equal Employment
                        Opportunity Commission to this complaint.)*

C.        Only litigants alleging age discrimination must answer this question.

          Since filing my charge of age discrimination with the Equal Employment Opportunity Commission
          regarding the defendant's alleged discriminatory conduct *(check one)*:

                        60 days or more have elapsed.

                        less than 60 days have elapsed.

## V.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal
arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the
amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive
or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive
money damages. (Please see attached Declaration, and attached STATEMENT of claim)

          As a direct and proximate cause of the actions of Defendant Howard University I will be virtually unable
          to get in the year cycle a similar position of residency to work toward proper medical credentialing.

          As a direct and proximate cause of the actions of Defendant Howard University I am without a job and
          unable to secure same in my field for the foreseeable future and as such has and will experience wage
          loss, back present and future in an amount according to proof and request monetary damages.

          Inability to secure employment comparable due to the defamation in my file is expected to cause
          damages combined in an amount of not less than three million dollars ($3 million). Defendant deprived
          me of back-and forward pay under the existing contract, which would amount to $8,330 for the
          remainder of my first year with Defendant and presumably $52,080 in my last year of the residency
          program, for a total of $60,410. Defendant deprived me of not only $60,410, but also what I would have
          earned in a career as a licensed board-certified Family Medicine Physician. In the Washington, DC area,
          that would have amounted to millions. The median income for Family Physicians in the Washington area
          in 2016 was $181,770 per year. Assuming a 30 year career, that comes to $5,453,100 plus wage
          inflation. Assuming an average salary of $50,000 for other employment, and a 30 year career, expected
          earnings would be about $1.5 million. By effectively depriving me of my professional career, Defendant
          deprived me of well over $3 million dollars.

          Additionally I require deleterious slanderous and/or libelous defamatory material in my file be purged.

          I also requests a letter of recommendation and letter of apology.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

## VI.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.   For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 11/7/18

Signature of Plaintiff   *Danielle K Shapiro*

Printed Name of Plaintiff         Danielle Shapiro

### B.   For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

COMPLAINT FOR EMPLOYMENT DISCRIMINATION- STATEMENT OF FACTS AND
STATEMENT OF CLAIM

STATEMENT OF FACTS

**Background**
1. I, Dr. Shapiro, the Plaintiff, was employed as a resident physician in the Family Medicine Department at Howard University from July 1, 2016 to May 2, 2017. For the July 2016-June 2017 Academic year, the Family Medicine Department had three resident vacancies. Two of the positions were available due to former Post-graduate Year 2 (PGY2) senior residents' repeated failed attempts on the United States Medical Licensure Examination Step 3, a high stakes test required for medical licensure and completion of year 2 of the residency. I accepted the position to start at Howard in July 2016 as a second year resident (PGY 2) not knowing at the time the reason for the vacancies.

2. I was the only Caucasian, Jewish, American female in the Family Medicine Residency program during my time there between July 2016 to May 2017. The racial, religious, national origin makeup of the Family Medicine leadership and faculty more closely resembled that of the other residents in the Family Medicine program. The other new hire for the PGY2 spot was Dr. Rufina Odigwe, an African born female, and of the same national origin (Nigeria) as the Program Director and other supervisors.

3. My career path took a starkly different direction than that of the other new hire for the second-year resident position for the July 2016-June 2017 year. In late January 2017, we both received a notice of promotion to the next level, yet she and all the residents ultimately moved on to their subsequent next levels, and I did not.

4. I worked hard, performed well on training exams and practicum, patients appreciated my compassionate and competent care, I acted in the interest of public health and safety of my patients and the community, and I acted to advocate for their rights and my own rights as they were violated.

5. Despite my record of hard work and professionalism and continued hard work at Howard, absurdly my employment file was being poisoned with inaccurate false aspersions on my professionalism, character and performance and statements of alleged witnesses engineered by management/attorneys to set up a termination. These false inaccurate reports and statements were pretexts for subsequent negative employment action, including and ultimately leading to constructive discharge and and an end to my career.

6. Throughout my time in the Family Medicine program, I was treated differently from similarly situated employees (including the new hire at my level, the other 5 residents at my level, the 6 residents below my level, and 4 residents above--in whole, the 16 residents in the Family Medicine program).

7. My supervisors included 3 chief residents (a chief resident is a resident in the 3rd year of his training), Dr. Oulatosin Omole, an African born male, Dr. Abiodun Otolorin, an African born male, and Dr. Jericho DeMata, an Asian male. Program Director Dr. Oladunni Filani an African born male, and Department Chair Dr. Mark Johnson an African American male.

**Title VII Discrimination, Harassment, and Adverse Actions**
8. A pattern of discrimination was present throughout my time in the Family Medicine program at Howard. Discriminatory behavior towards me had begun before my first official work day and before taking on any clinical duties. Important information regarding orientation activities and onboarding communications/materials were not provided specifically to me. Specifically I was provided an expired and invalid meal ticket for the July 2016 orientation when all other residents were given a current and valid ticket. I was not submitted by the Program leadership to the national provider registries (National Plan and Provider Enumeration System/NPPES), which is a requirement imposed by the Centers for Medicare and Medicaid Services.

1 of 12

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION- STATEMENT OF FACTS AND STATEMENT OF CLAIM

9. I was not provided opportunity to attend resident events, such as the welcome of new hires event in July 2016, as I was intentionally put on call duty when these events were scheduled. I was not included in holiday events on or about late December 2016, which were referred to by program leadership as a "Christmas party" and "Secret Santa" event and her food at a potluck was intentionally thrown in the trash before the event.

10. I was also exposed to hateful comments and hate speech about Americans, the American government, LGBT community, the Washington, DC African American community, and other disenfranchised groups during weekly meetings between the residents and the program's behavioral specialists. The behavioral specialist was a Reverend and gave Christian sermons. The meetings were biased and closed minded. I was not accommodated for time off to observe high holy Jewish observances and I was told that I had to work the Christian holiday of Christmas because I was Jewish.

11. In addition, the protocols for evaluation of residents as dictated by the accreditation council bylaws were not followed specifically for me (there were no rotation evaluations gathered for my file, and contractually required meetings [i.e., the biannual program directors meeting] were delayed and cancelled by Defendant). It should be noted that the Residency Program is an educational Program.
The educational program is subject to standards set forth by the Accreditation Council for Graduate Medical Education (ACGME). That being so, residents are to learn through experiential training, informal feedback, coaching and counseling meetings, written evaluations by Attending preceptors, and through formal summative feedback, which is known as Milestones Evaluations/Biannual Program Director's Meeting.

12. I was singled out by Defendant and was treated differently than the other residents in my program. The Defendant took significant adverse actions against me, including failing to provide feedback, evaluations, and summative in-person performance reviews, resorting to formal disciplinary measures and adverse action for fabricated cause, and in lieu of less formal corrective actions, issuing a formal warning letter in March 9, 2017 and placing me on probation in April 26, 2017.

13. The  Howard University Employee Handbook reads in relevant part:

*At early signs of problems in an employee's performance, conduct, or attendance, the supervisor should discuss the concern with the employee and counsel him or her to address and correct the problem.*

*If counseling has been ineffective, the supervisor should schedule a coaching meeting with the employee to outline the specific areas of poor performance, conduct, or attendance and notify the employee that immediate corrective action is necessary to avoid formal discipline.*

14. Defendant engineered false allegations of performance deficits to falsely validate adverse disciplinary actions. Defendant's claims of alleged substandard performance were starkly inconsistent with my record of high achievement and professionalism. My achievements and professionalism were well recognized by previous mentors and supervisors, and notably in medical school I had received membership to the the selective national medical Honor Alpha Omega Alpha for my exemplary good character.

15. I was repeatedly subject to singling out by my direct supervisor, the program director, Dr. Filani, an African born male. On one occasion in November 2016, Dr. Filani singled me out in a written email for not attending a meeting when other residents had not attended. I explained in great detail that notice of the meeting was unclear and given at such short notice. I also noted that other residents were not present for the meeting. Subsequently following this notice, Dr. Filani sent a written warning to *all* of the residents noting that a "few" residents had not attended the meeting.

16. This pattern of singling out was also evident in Department Chair's Mark Johnson's Formal Warning Letter of March 2017 and Probation Letter of April 2017 where Defendant claimed that I refused to see patients. This was an apparent problem for all the residents, for on or about October 30, 2016, Dr. Filani

COMPLAINT FOR EMPLOYMENT DISCRIMINATION- STATEMENT OF FACTS AND STATEMENT OF CLAIM

had to remind all residents collectively in an email to all the residents that none of them is to "decline seeing a patient."

17. The singling out relates to an indecent in February 2017. During a call shift in February 1, 2017, I took a page from Dr. Kolko, a male, a clinical supervisor at the outside maternity care clinic, La Clinica. I took down the pertinent information and appropriately triaged and admitted the patient. As was protocol, I contacted Dr. Somwaru, the resident responsible for this labor in general patient. Dr. Somwaru outright refused to attend a birth despite being the responsible resident and being told by the chief resident Dr. DeMata to do so.

18. I did not know this at the time, but in fact three weeks after the event, on Dr. Filani's insistence, Dr. Kolko, wrote "As per your request, here is a recollection of the phone conversation I had with [Shapiro] 3 weeks ago" where he references the phone conversation he had with me during the February 1, 2017 call shift. Absurdly, Dr. Kolko alleged that I stated I was would not be involved in deliveries, but he admitted he did "recall exactly" what was said. This was absurd because this was not my delivery to refuse, when I was alerted of this patient and spoke to Dr. Kolko, I expected that the responsible resident Dr. Somwaru was coming in to manage her patient according to the usual protocol. Dr. Somwaru refused. It is clear that Dr. Filani singled out only me in attempts to gather considerably false accounts to fabricate performance defects. Though I myself did not refuse to see a patient, others did, yet, it was I who was put on probation for refusing to see patients.

19. I later talked with Dr. Kolko, on or about April 12, 2017, not at the time knowing that Defendant had engineered a plan to coerce others to make reports about me to set up a plan for termination. Nor did I know that he had sent an email the month prior to Dr. Filani on Dr. Filani's request to create false reports of misconduct in my file. I spoke with him openly. He became nervous, saying he had to "prepare" to speak with me. He stated he was a poor communicator. He stated that "something was going on" with the residency program, but did not elaborate on what that was. I asked questions, he answered. I was not forceful nor did I make any threats. I wanted to know what was happening because I had reason to feel that my job was being threatened. Absurdly Defendant made a bogus allegation that I had 'bullied' Dr. Kolko when indeed that was not the case. They falsely and bizarrely used the allegation to place me on probation just over 2 weeks after this event on April 26. 2017. It is not bullying to ask questions or ask for feedback from a supervisor. It was the role of the supervisor to provided the learner with feedback so that any issues can be addressed and corrected. Seemingly Defendant coerced Dr. Kolko into making yet another false report and attack on my conduct and character. Defendant utterly fabricated a serious offense of misconduct on my part when there was none. Defendant was targeting me, not the other way around.

20. Another instance of singling out occurred later that month in February 2017. In an incident involving a test, Dr. Filani singled me out quite bizarrely with false allegations that I refused to complete work and advised other residents to do the same. In late February 2017 regarding a test. The residents sat for an in-person exam held through a testing vendor's online website. The vendor collected the user's test answers in real time and scored the tests too. Dr. Filani proctored the exam in person. Later that day, Dr. Filani advised the residents of his "mistake" (a claim that he closed his computer lid) in scoring the exams and they would have to take the exam again.

21. Understandably concerned, I discussed the matter with the vendor who handled the technological aspects of the exam. The vendor refuted Dr. Filani's claim that the exam results were lost; in fact, I learned that the results were safely stored at the vendor's site. The vendor explained the exam need not be taken over. I then spread this good news in an informal email to my peers.

22. Days later, I later received an email from Dr. Filani where he falsely accused me of instructing the other residents to disregard his instructions. I explained in great detail the facts and the events and that I was merely sharing information. In fact, it was no such instruction. The allegation was so utterly false and ludicrous. Dr. Filani's reaction and manner in which he rebuked me was uncalled for.  This test incident

3 of 12

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION- STATEMENT OF FACTS AND STATEMENT OF CLAIM

and its aftermath was just an example of the growing body of his hostile treatment and harassment directed towards me and the starkly differential treatment I faced in comparison to my peers.

23. Likewise, Dr. Filani and management/HR started to engineer a wild smear campaign using cyber communications application and my subordinates/interns who started maligning me on this cyber application weirdly. Management conspired to generate negative reports of my supervision to falsely document bogus defects of performance.

24. On or about February 6, 2017, during a mandatory resident meeting, I recall sitting by the interns and them staring and snickering at me while on their phones. This happened on multiple occasions. I was also told by the interns that they had a chat room on a cyber communications applications where they would talk about me.

25. On or about February 18, 2017 an intern opened up the chat room where I could see several statements naming me by the name "Shapiro." I saw that the interns had a conference call sometime in the first week of February 2017, that they had previously met with the chief residents, and seemingly the chief residents and the interns collaborated on writing a letter to launch allegations against me. The interns recounted the importance that each and every one of them had to sign his/her name to the letter. One intern noted that "time is precious." There were messages containing odd emoji symbols. In one message the intern who was tasked with sending the letter, Dr. Mubarak Hassan affirms that he was "waiting for the rest." Seemingly Dr. Hassan was waiting for the rest of letter to be provided to him or for the approval or direction from an un-named person(s).

26. Neither Dr. Hassan nor any of the interns talked to me while on duty with me or at any time about any alleged concerns about my supervisory role. If indeed interns had concerns about me, *why did no one directly discuss these with me? Why had they employed secretive chat rooms and conferences to exclude me from the discussion?* The interns' chat board and letter is representative of a seriously hostile work environment where I was singled out, bullied and cyber-bullied, and subject to hostility.

27. In mid February 2017 I was supposed to have a scheduled program director's meeting with Dr. Filani. Dr. Filani was supposed to have this meeting with all of the residents to review interval and summative performance evaluations. All other residents had their meeting with Dr. Filani in December 2016 and January 2017. Oddly my meeting was cancelled with little notice and with no legitimate reason and with no alternative date set for a rescheduled meeting. I had even worked with Dr. Filani earlier that morning on the day the meeting was scheduled.

28. Almost two months later in early April 2017 the meeting was brought up, but not by Dr. Filani, rather I was oddly being single out to meet with Dr. Johnson. This was especially odd because this was a program director's meeting and Dr. Filani was the program director, not Dr. Johnson. All other residents met with Dr. Filani, not Dr. Johnson.

29. In February 2017, I had confidentially reached out to the Office of the President about my experience in the Family Medicine program and unbeknownst to me at that time the President's office had informed the Family Medicine Department that I had done so. I did not know at the time, but in fact the Department held meetings about me, and I was referred to as an ongoing "discussion of concern." In the minutes of a March 1, 2017, the Department planned to "document" things concerning me and calculated plans to "to dot all I's and cross all T's." Therefore, the Department gathered documentation from peers and supervisors. At the time, I was unaware of the these meetings and the meetings I was supposed to have with the program director were oddly canceled and delayed.

**Raising concerns with HR and Retaliation**
30. On March 9, 2017, I met with Dr. Antwan Lofton, Employee Relations/HR specialist, a meeting which lasted for over an hour. In this meeting I raised many concerns about mistreatment, differential treatment, and retaliation. Upon hearing the details, Dr. Lofton recommended that a course of "interim remedial action" was needed, since he assessed that I was "in a hostile work environment." He affirmed

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION- STATEMENT OF FACTS AND STATEMENT OF CLAIM

he would meet again with me and that his assistant would need to block out at least two hours of time. In a body of retaliatory moves against me, within a couple of hours of the meeting, to my shock I then saw an email from Dr. Johnson and notice that I was being issued a formal written warning. Formal written warnings are one form of formal disciplinary actions. I was totally blindsided by this. I reached out to Dr. Lofton immediately and repeatedly for assistance, but he made himself unavailable.

31. On March 29, 2017, I attended the Meet the [University President's] Cabinet event, an open forum for addressing questions and concerns to Cabinet members, including the University Provost and Director of HR among others. I, like all other attendees, approached the microphone to address the panel. I mentioned no specifics, but identified an ongoing issue in the Hospital. The panel members told me that they would follow up with me at the concluding reception. I was expecting to talk directly with panel members including HR; however instead, I was oddly cornered by members of Howard Office of General Counsel and did not make it into the reception room. Rather, they kept me in the hallway and then brought me into a small unfurnished room.

32. Counselors threatened me that things were "underway" and "in the works." They condescended to me, "we can't protect you from what is normal." They affirmed, "the fact that you made a complaint does not protect you from what is normal." The counselors quizzed and questioned me, but refused to answer my questions. I had no idea there was a "legal matter" at that time, and no one was present to legally represent me.

33. It became clear that Defendant did not intend to provide any remedial action. They engineered the hostile work environment, including the mistreatment of me by my peers and subordinates, and second and first level supervisors. Their intent was to clearly take any steps necessary to run me out and use the trappings of disciplinary measures to falsely validate actions taken against me.

34. The heavy handedness with which I was rebuked during the March 29, 2017 public meet-and-greet, demonstrates a clear pattern of singling out, discrimination and harassment. I was subjected to such hostile treatment and felt so threatened that my father and/or mother had to be on stand-by waiting for me to complete my shift to take me home. I also became aware of reports of physical assault of a resident physician by an attending physician. I became actually frightened for my safety.

### Sexual Harassment, Reports to HR, and Retaliation

35. I was also subject to uncomfortable interactions with Department Chair Dr. Mark Johnson which compelled me to make a formal complaint to HR. On or about December 8, 2016, I had an extremely uncomfortable awkward interaction with academic advisor, an African American male, and the Department head Dr. Mark Johnson. At the time that he was made the Department head, I, along with several others congratulated him by extending a hand for a simple formal professional handshake, but to my shock he grabbed me, pulled me close to him, chest to chest in a bear hug wrapping his arms around me in an overly intimate gesture. I was shocked, stunned and taken aback by this. I did not observe him doing this to any other person who congratulated him—or at any time. It was completely uninvited and unwelcome conduct. I was so shocked by this and made so uncomfortable. This interaction to me was severe because I am Jewish female who is observant of the practice and values of "Shomer Negiah," which means "touch"; it is the Jewish law that forbids and/or restricts physical contact with a member of the opposite sex. This overly intimate and uncalled for hug/touching violated my beliefs and observance. Moreover it was extremely unprofessional and unwelcome and he knew or should have known it. I was so taken aback and upset I called my sister to discuss how I felt. From that time I did not meet with Dr. Johnson privately, so I did not have to put myself in a situation where he could place his hands on me. I reached out to my union representative to have another party present for any meeting that would take place. In March 2017 I filed a formal HR Complaint about it.

36. The unwelcome, sexually-tinged hug was harassment in its own right, and my reports about the incident led to Defendant's retaliation against me.

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION- STATEMENT OF FACTS AND STATEMENT OF CLAIM

37. For instance, in mid February 2017 I was supposed to have a scheduled program director's meeting with Dr. Filani. Dr. Filani was supposed to have this meeting with all of the residents to review interval and summative performance evaluations. All other residents had their meeting with Dr. Filani in December 2016 and January 2017. Oddly my meeting was cancelled with little notice and with no legitimate reason and with no alternative date set for a rescheduled meeting. I had even worked with Dr. Filani earlier that morning on the day the meeting was scheduled.

38. Almost two months later in early April 2017 the meeting was brought up, but not by Dr. Filani, rather I was oddly being singled out to meet with Dr. Johnson. This was especially odd because this was a program director's meeting and Dr. Filani was the program director, not Dr. Johnson. All other residents met with Dr. Filani, not Dr. Johnson.

39. Dr. Johnson's insistence that he himself conduct the evaluation meeting confirms a retaliatory motive. And, pursuant to the Agreement and the residency accreditation board's bylaws, which require a biannual program directors meeting, the expectation of meeting with Dr. Johnson would constitute a <u>clear alteration of the conditions of my employment.</u>

40. During the week of April 3, 2017, when the meeting was to occur, and notably less than a week after I filed a report with HR, Dr. Johnson exhibited strange behavior toward me. I had requested that Dr. Johnson come and evaluate a clinic patient, as is required of a supervising doctor to attend to patients in distress. When Dr. Johnson came in the exam room, he shut the door, stood over me, physically blocking the door was a stood between me and the door. He placed his hands on my shoulders and back, patted me repeatedly, and oddly addressed me as "young lady." He reminded me of the scheduled meeting. Dr. Johnson's behavior made me feel extremely uncomfortable. I even sent a quick text message and call to my sister after the incident because I was so shocked by it.

41. Understandably, I was concerned about meeting with Dr. Johnson and reached out to my union representative for assistance.

42. Following the instructions of the union representative, I requested that my representative be present for the meeting. Dr. Johnson wrongly accused me of avoiding the program director's meeting. "Generally speaking," Dr. Johnson wrote on April 6, 2017. "you may not refuse to receive your performance appraisal or to attend a meeting that is for the solve purpose of delivering your performance appraisal..." Recall that is was Defendant who cancelled the meeting which had been previously scheduled nearly 2 months prior. It was not I who cancelled the meeting and yet absurdly I was being singled out and falsely accused of doing so.

43. I was concerned about meeting with Dr. Johnson in his quarters, as I had an unresolved harassment complaint against him. I reached out to the Residency Union representative, Ms. Martinez and to HR asking that my union representative to be present in person at the meeting. The union representative was unavailable for an in-person meeting, and I was told the meeting could not be delayed on Dr. Johnson's insistence (even though it had already been delayed by Defendant for four months and it was not supposed to be conducted by Johnson, but rather the program director per ACGME guidelines). So I asked to meet with another faculty member, but was denied. I was callously treated by HR and told by HR "while some accommodation has been made due to your concerns, the meeting must go forward."

44. The forced meeting with Dr. Johnson was placing undue strain and stress on me. However, when I arrived at Dr. Johnson's quarters, I was escorted into a conference room where shockingly Dr. Filani and Dr. Goodwin, an HR executive, were there waiting for me. Dr. Filani stated "I was asked to be here this morning." The last-minute change on Defendant's part strongly suggests that Defendant should not have forced me to meet with the accused party in the the first place. This behavior reflected a body of bullying, intimidation, and harassment directed towards me.

45. Ms. Martinez, the union representative, was called in over the telephone. During the meeting, Dr. Filani only spoke into the phone to Ms. Martinez regarding me, and would not directly address me. He

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION- STATEMENT OF FACTS AND STATEMENT OF CLAIM

did not provide me with any feedback whatsoever outside of what he read off of a satisfactory milestone review, he simply read off from the template. He did not raise any concerns about my performance, professionalism, or provide any directed negative reports. When I asked any other questions, particularly, when I raised the questions of why I was being treated different than any of the other residents when it came to scheduling and executing this meeting, Dr. Filani refused to answer me, stating, "I can't say anything other than what we already discussed." He got up and left the conference room. I asked the HR representative Dr. Goodwin for an explanation, but she oddly responded that she was 'not there for me, to answer my questions, only to witness and observe'

46. Such disparate treatment carried over following the April 7, 2017 meeting. One week later, Dr. Filani issued a written warning on April 12th and 13th, 2017, Yet, at no time before, during, or after the meeting did Dr. Filani bring up any concerns with me in person. In this written warning, Dr. Filani's noted that I had 33 absent work days (all of which were part of my paid sick leave/vacation) In accordance with the Residency Union contract, of paid leave, I had used 12 of my 13 contractual sick leave days. I took sick leave after suffering a workplace injury at the end of September 2016, and two of those days were spent in the doctor's office in order to obtain notes on Dr. Filani's request. On March 30, 2017, I again went to my doctor's on Filani's request to obtain a note on the recommendations regarding a shoulder sling. The dates of October 14 through 20, 2016, and April 14 through 27, 2017 were part of my approved annual leave, which were to be provided per the accrediting board guidelines. I was not in violation of leave policies per the contract. It is not unreasonable to request sick leave; on the contrary, it is unreasonable to place a resident on probation for alleged "excessive absenteeism" on grounds that the resident used sick leave.

47. Dr. Filani warned that I was not meeting expectations per the accreditation board for family medicine.

48. The relevant policy holds that:

*Residents are expected to perform their duties as resident physicians for a minimum period of eleven months each calendar year. Therefore, absence from the program for vacation, illness, personal business, leave, etc., must not exceed a combined total of one (1) month per academic year. The ABFM defines one month as 21 working days or 30 calendar days...Absence from residency education, in excess of one month within the academic year (G-1, G-2 or G-3 year) must be made up before the resident advances to the next training level, and the time must be added to the projected date of completion of the required 36 months of training.*

49. According to Dr. Filani's warning, I was absent for a total of 33 calendar days, a difference of only 3 days, which could have been added to the 36 months of required training. Doing so was not unusual for the program director had made that adjustment for other residents in the program. Notably there were many other residents, approximately six other trainees, in the program who were off cycle.  Those residents were accommodated accordingly with an extension on their completion dates for causes including FMLA leave, bereavement, sick leave, academic failures, and others. To my knowledge, Dr. Filani did not issue any of the six other residents resident a formal warning or place them on probation.

50. In a stark contrast, I was subject to blatant differential treatment regarding leaves and absences. Instead of being offered the accommodations which were provided to all other residents in the training program, I was instead charged with "failure to demonstrate a satisfactory level of training and participation because of [my] excessive absenteeism" and was placed on probation. On April 7, 2017, when meeting with Dr. Filani for the extremely delayed mid-year performance review, he did not mention any concerns regarding alleged absenteeism, or provide me with the chance to develop a plan or schedule to make up missed days. Rather, he passively sent the formal warnings and communications while I was actually away from the training program on approved annual leave. The manner in which Dr. Filani did so was not only discourteous, it was a device to further relation and adverse actions.

51. Moreover, the timing of the probation clearly reflect retaliatory intent. For, not even a month after filing a report of sexual harassment, and less than 3 weeks after requesting a meeting not be held with the

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION- STATEMENT OF FACTS AND STATEMENT OF CLAIM

accused, Defendant placed me on probation.  Absurdly, one of the reasons Defendant provided for placing Dr. Shapiro on probation was for "inability...to receive constructive feedback," which is a misplaced accusation based on Dr. Johnson's disingenuous charge that I was was "refus[ing] to receive [my] performance appraisal or attend a meeting that is for the sole purpose of delivering [a] performance appraisal." As a paying member of the residency union, I had a clear right to consult with my union representative, and it was Defendant who indeed changed the meeting, not I. The accusation is not based on fact, and thus the placement of me on probation as a disciplinary action confirms retaliatory intent.

**Disability Discrimination, Harassment, Failure to Accommodate, and Retaliation**
52. On September 30, 2016, I suffered a needle stick injury and bodily fluid exposure while assisting the Obstetrics and Gynecology Attending physician Dr. Jeffrey Sellers, an African American male, in post-vaginal delivery surgical repair. Dr. Sellers did not provide Plaintiff with retractor tool instead oddly instructing me to use her hand as such. Sellers struck my left finger, acknowledged doing so, and instructed me to place her hand back. Sellers did not interrupt his procedure, time out, change the needle, or allow me to exit and attend to her injury.

53. While needle sticks are occupational hazards well recognized by OSHA, procedures such as using retractors where they are supposed to be used is known to mitigate against getting stuck while sewing stitches. The incidence of someone getting stuck by someone stitching a patient post delivery should be next to nil when the requisite non-negligent attention is paid. Defendant's frighteningly sloppy procedures did not comport with the University's stated Protocols or those demanded of all Hospitals in observing safety standards. Those safety standards have been articulated by OSHA.

54. Invoking my protected right and duty as a physician to report safety concerns, I filed a report with OSHA on October 5, 2016. I also filed reports internally with the Hospital's Risk Management and Compliance Departments.

55. The Compliance specialist spoke frankly with me. She told me that she was not surprised by the sharps incident. She informed me rather nonchalantly that the Hospital had a track record of covering up its misconduct, including but not limited to patient safety matters. She also told me that she believed that Dr. Sellers did not care about the patient with whom he acted negligently because he didn't think she would say anything because she was a Hispanic immigrant. I was utterly horrified by this.

56. Defendant's own investigation of the sharps incident had many shortcomings. Defendant fabricated records (including my own medical records contained in Howard Hospital's Emergency Department) to cover up the fact that they have lax cross contamination policies creating a serious potential hazard in the Hospital. The Hospital refuses to correct the report despite its obvious errors. The Hospital has violated federal standards and processes (HIPPA) with regards to handling my request to access my record, amend my record. They have also committed unauthorized sharing of my record.

57. Furthermore, I was subject to discriminatory treatment for being the victim in the sharps incident, starting with the unauthorized sharing of her information amongst peers and supervisors. Whether that in and of itself is deemed as a HIPAA breach is irrelevant. Not only did those actions represent a clear lapse in professional conduct, but they also represent clear singling out and discrimination.

58. Furthermore, Defendant penalized me for taking necessary time off to tend to the medical needs their negligence posed. Further, Defendant was trying to create a wildly false record to set up termination.

59. Because I faced a sharps injury and exposure to bodily fluid with unknown contaminants I had to take a blood test for HIV and hepatitis. The patient had a venereal disease (chlamydia). This scare caused physical and emotional distress and anguish. I had to relive the trauma and face this scare every several months over the next 12 months to test for serious blood borne illness.

60. On or about October 11, 2016, my direct supervisor Dr. summoned me to a meeting to discuss the sharps incident. He initially stated the meeting was going to be held along with the chief resident Dr.

COMPLAINT FOR EMPLOYMENT DISCRIMINATION- STATEMENT OF FACTS AND
STATEMENT OF CLAIM

DeMata who was a party and witness to the incident. (He was involved in the delivery and in the room).
This was a lie because Dr. DeMata knew nothing of the meeting. Dr. DeMata came to the meeting
anyway but was immediately dismissed. Dr. Filani then turned the meeting into an interrogation. He
asked me "if there was anything they needed to be worried about" referring to the results of my blood
tests. He stated he did not believe in my "version" of the event. He provided insulting and negative
feedback stating he or others are "walking on eggshells" around me.

61. The sharps injury and bodily fluid exposure resulted in a worsening of my underlying health
conditions, causing impairment which required me to take days off of work. I duly provided direct
supervisor Dr. Filani with notes from her physician attesting to her medical conditions (autoimmune
disorders, positive autoimmune markers) in support of the request for time off. In addition, I duly made
request for reasonable accommodation prior to my return to work. Prior to my return to work in early
October 2016, my physician note stated : "as she has not fully recovered, she should have the help of the
interns and residents. Course of recovery is unpredictable." Thus, I duly made a request for reasonable
accommodation as defined by "a change in the work environment on in the way things are customarily
done...". Despite the request and supporting documentation (physician's note), the residency program did
not provide any such accommodation. Even worse, taking said time off for legitimate medical reasons and
requesting "help" resulted in Defendant taking adverse actions against me including placing me on
probation for alleged "failure to demonstrate [an] understand[ing] of [the] importance of the health care
team" and "excessive absenteeism."

62. Thus it is clear that I duly provided direct supervisor Dr. Filani with physicians notes attesting to
medical conditions in support of the request for reasonable accommodations. Deplorably, taking said time
off for legitimate medical reasons resulted in Defendant taking adverse action against me.

63. Additionally, in March 2017, management took me off Hospital call duties while she was wearing a
shoulder sling without consulting me or offering a more reasonable accommodation; however, I was kept
fully on her duties for their clinic, which is busy and is usually more demanding than the hospital. I was
demanded to go the doctors to obtain a note on my shoulder, as to the length of time I would need to wear
the sling. Defendant retaliated against me and I was reprimanded for taking allotted contractual sick leave
to go to the doctor's office. To much shock, this "absenteeism" was absurdly misplaced as an allegations
of performance defect.

64. Defendant later argued to the EEOC that I did not "meet the same qualitative production standards as
a non-disabled employee in the same job" referring to the policy on leaves and absences. But this is
simply false and does not validate the actions they took against me. For Defendant did waive the this
policy for other residents. According to Dr. Filani's warning, I was absent for a total of 33 calendar days
difference of only 3 over the 30 day maximum. These 3 days could have been added to the 36 months of
required training, as was the case for other residents in the program who, in some cases, had missed days
of work for sick leave. In the 2016-2017 academic schedule for the year, there were at many other
residents (about six) in the program who were off cycle. Those residents were accommodated accordingly
with an extension on their completion dates. In a stark contrast, I was subject to blatant differential
treatment. Howard did waive the policy for other residents, clearly singling me out by strictly enforcing
the policy only when it came to me.

65. Worse, Howard abused enforcement of a policy which is adjustable as appropriate and used the
trappings of disciplinary actions to retaliate against me for taking legitimate sick leave. In the face of
these facts, it can hardly be said that my disability and request for accommodation did not factor into
Defendant's discrimination and retaliation against me.

**Disparate Treatment, Intolerable Work Conditions, and Constructive Discharge**
66. Respondent uses the trappings of disciplinary measures to falsely validate actions taken against me.
Shapiro. There is a palpable variance between what the Parties' contract and Defendant's own Employee
Handbook (an extension of the contract) advise, on one hand, and on the other, what actually happened.
Defendant skipped the less formal corrective actions and went straight to what it confesses is a "formal

COMPLAINT FOR EMPLOYMENT DISCRIMINATION- STATEMENT OF FACTS AND
STATEMENT OF CLAIM

written warning,"which, per its own Agreement with me, is an "adverse action." Also, the timing of
disciplinary steps further shows that the exercise was a sham.

67. The manner of the placement and the timing of probation were unusual. Defendant did not even give
me the courtesy to wait until I was present. From the time of issuing the warning letter more than two
months prior, Howard had not provided me any specific steps for corrective action. Defendant had
deplorably omitted the steps that would have been advisory; rather, Defendant acted counter to its own
internal policies and with haste. The alleged conduct and performance issues alleged by Respondent in the
warning and probationary letters do not reach a level of severity that would warrant omission of key steps
in disciplinary action. The timing of the disciplinary action furthermore shows that it was a sham.

68. In addition, as stated above, the timing of my complaint of sexual harassment, request for
accommodation regarding a scheduled meeting with the accused party and Defendant's placement of me
on probation establish a clear and direct causal relationship between the protected activities and the
adverse action.

69. Defendant's repeated and ongoing harassment and retaliation against me are rather textbook. They
twisted elements that I complained of or made reports about and fabricated reports and falsely reflected
these attributes onto me. I made a patient safety report, so Defendant stated I was a danger to patients; I
made a complaint about mistreatment and harassment, so Defendant stated I was a bully; I took allotted
time to attend to my medical needs, so Defendant stated I had disregard for duty to patients. These bogus
performance deficits Defendant complained of were a sham and the disciplinary steps taken were also a
sham. There was no way to improve on such false and ludicrous performance deficits. Any such
improvement plan given with probation was designed by Defendant to have me fail and falsely validate
termination. Defendant created these conditions that were so intolerable, any reasonable person would
have left. Thus Defendant effectively forced me out.

70. The hostility and discriminatory treatment toward me became so intolerable, and the Hospital had not
taken any steps to even initiate a process of remedial action. I was effectively forced out. In addition, I
was told through hired counsel at the time that Howard counsel would have her resign and they would
"revoke the probation." On May 2, 2017, I thus submitted a letter of resignation.

71. As a direct and proximate cause, my medical career is derailed. Programs do not normally take a
resident for just the third year in a three-year qualification scheme required by the Accreditation Council
for Graduate Medical Education and the Accreditation Board for Family Medicine. According to the
ABFM, "Long-term care experiences must occur over a minimum of 24 months." Funding by Centers for
Medicare and Medicaid is limited to 3 years which disincentivizes programs to accept residents who have
already completed majority of a program. I entered the Howard Residency as a Post-graduate Year 2
advanced position, faithfully with the mutual expectation that Defendant would need to retain me for two
years. No residency program in the Washington area or otherwise would take me. I might have become
duly qualified had I been allowed to complete a second full year and had I not had strikes against me
(probations are considered serious actions and are reported to state medical boards and accreditation
boards). Defendant prevented me moving on in my career for the foreseeable future. Their actions not
only directly caused me a loss of wages and future earnings, but have denied me a privilege to be in a
career that I worked years to earn, a sense of belonging in my professional community, and a large piece
of my personhood and identity then, now, and in the future.

73. Because of the way that Defendant has treatment me as an employee with a disability and as a patient
in their hospital, including but not limited to fabricating my medical record and denying the fair right to
amendment of spurious reports pursuant to HIPAA, I am terrified of ever being a patient in the Hospital or
having any of my family members become a patient there. I have had to be conscious of where we go so
we are not in the zone of the Hospital and I or my family has had to redirect ambulances from that
destination. The Defendant has created an experience that has been so traumatizing and that trauma
continues to be so severe and pervasive. These are insurmountable damages for which I justly seek action.

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION- STATEMENT OF FACTS AND STATEMENT OF CLAIM

STATEMENT OF CLAIM

CAUSE OF ACTION I- Violation of TITLE VII DISCRIMINATION (race, gender, religion, national origin)

74. I repeat and reallege allegations and incorporate all facts of prior paragraphs as set forth herein.

75. Defendant has discriminated against me on the basis of race, religion, and/or national origin in in violation of Title VII by denying me the same terms and conditions of employment available to employees who are not white, Jewish, or American born, including but not limited to, subjecting me to disparate working conditions and denying me the opportunity to work in a setting free of unlawful harassment.

76. Defendant has discriminated against me in violation of Title VII by creating, fostering, accepting, and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment.

CAUSE OF ACTION II - Retaliation in Violation of Title VII
77. I repeat and reallege allegations and incorporate all facts of prior paragraphs as set forth herein.

78. Defendant has retaliated against me in violation of Title VII for opposing and/or complaining of Defendant's discriminatory practices against me by subjecting me to acts of discrimination, harassment and humiliation, breaching my contract with Defendant including but not limited to resorting to formal adverse disciplinary measures, punishment and harassment against me for making a sexual harassment complaint, inappropriately forcing or threatening to force a meeting with the accused party, using disciplinary steps to falsely validate retaliatory steps, and encouraging and/or coercing co-workers to make false inaccurate reports and statements as pretexts for subsequent negative employment action. And falsely contradicting my allegations of discrimination, harassment and/or retaliation.

79. As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of Title VII, I have suffered and continue to suffer severe mental anguish and emotional distress, as well as physical injury, for which I am entitled to an award of monetary damages and other relief.

CAUSE OF ACTION III - (ADA discrimination Violation of Duty of Reasonable Accommodation Under ADA)
80. I repeat and reallege allegations and incorporate all facts of prior paragraphs as set forth herein.

81. Defendant violated its duty under the ADA to provide me with an environment free of discrimination for actual or perceived disability. Defendant failed to provide reasonable accommodation for my disabilities (autoimmune conditions) when it denied my request for the reasonable accommodation identified by treating physicians, failed and refused to engage in discussion with me regarding his need for an accommodation, and/or failed and refused to engage in discussion with me regarding potentially providing alternative accommodations.

82. Defendant also violated its duty under ADA by subjecting me to harassment and punishment due to physical injury caused by Defendant's negligence and hazardous working conditions. Defendant deplorably mishandled my private medical information, including but not limited to placing doctors unauthorized sharing and fabrication of medical records. Defendant holds my record hostage by refusing to comply with HIPPA and provide amendments and access to a corrected record.

83. Defendant also violated its duty under ADA by penalizing me for taking time off due to physical injury caused by Defendant's negligence and hazardous working conditions or taking time off when directed to go to the doctors to obtain documentation. Defendant severely discriminated against me by misconstruing/conflating reasonable sick leave/time off as misconduct/performance issue when other residents without a disability did so and were not punished.

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION- STATEMENT OF FACTS AND STATEMENT OF CLAIM

84. As a direct and proximate result of Defendant's violation of its duties under the ADA, I have suffered and continue to suffer harm

PRAYER FOR RELIEF

I pray that the Court enter judgment in my favor and against Defendant, containing the following relief:

A.   A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States and the City of Washington

B. An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C. An order directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect my employment and my personal life

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate me for all monetary and/or economic harm;

E. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate me for harm to his professional and personal reputations and loss of career fulfillment;

F. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate me for all non-monetary and/or compensatory harm, including but not limited to, compensation for his mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, emotional distress and physical injuries

G. An award of damages for any and all other monetary and/or non-monetary losses suffered by me in an amount to be determined at trial, plus prejudgment interest

H. An award of punitive damages;

I. An award of costs that I has incurred in this action, as well as my reasonable attorneys' fees to the fullest extent permitted by law; and

J. Such other and further relief as the Court may deem just and proper.

JURY DEMAND

I, the Plaintiff, hereby demand a trial by jury on all issues of fact and damages stated herein.

11 / 9 / 18