# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
| --- | --- | --- |
| **DANIELLE SHAPIRO**, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 18-cv-2588 (TSC) |
| **HOWARD UNIVERSITY**, *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Danielle Shapiro, proceeding *pro se*, brings this employment discrimination action against Howard University and Howard University Hospital (collectively, "Howard"). This matter is before the court on Defendants' Motion to Dismiss (ECF No. 11) and supporting memorandum (ECF No. 11-1, "Def.'s Mem.").

Under Federal Rule of Civil Procedure 8, a plaintiff need only provide a "short and plain statement of [her] claim showing that [she] is entitled to relief," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted). Here, Plaintiff's Complaint (ECF No. 1, "Compl.") is neither short nor plain. It is a seven-page preprinted form titled "Complaint for Employment Discrimination" with a 12-page typewritten attachment titled "Complaint for Employment Discrimination – Statement of Facts and Statement of Claim" and three exhibits: Charge of Discrimination (EEOC Charge No. 570-2017-01490), a declaration in support of the

EEOC charge, and EEOC's Dismissal and Notice of Rights.[1] The court must consider more than

the complaint, however. *See Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C.

Cir. 2015) (noting the district court's obligation "to consider a pro se litigant's complaint 'in

light of' all filings, including filings responsive to a motion to dismiss"); *Schnitzler v. United

States*, 761 F.3d 33, 38 (D.C. Cir. 2014) (noting "the district court's obligation to construe a pro

se plaintiff's filings liberally, and to consider his filings as a whole before dismissing a

complaint"). Also before the court are Plaintiff's 245-page opposition (ECF No. 14, "Pl.'s

Opp'n")[2] consisting of a 42-page pleading and 39 exhibits totaling 203 pages, and her Surreply

(ECF No. 17).[3] While Plaintiff's submissions are not models of clarity, they are not "an

unintelligible rambling narrative of allegations," as Defendants characterize them. Def.'s Mem.

at 4; *see id*. at 12.

Having reviewed the parties' submissions, the court concludes that Plaintiff fails to state

disparate treatment, hostile work environment, constructive discharge and ADA claims upon

---

[1] Most references to the Complaint in this Memorandum Opinion are to the sequentially-numbered paragraphs of the Statement of Facts and Statement of Claim ("Compl."). Where the court refers to the preprinted form, it uses the page number.

[2] Plaintiff's opposition on 42 sequentially-numbered pages is divided into three sections: "Introduction" (pages 1-2), "Legal Arguments" (pages 2-6) and a "Declaration of Plaintiff" (pages 7-42) consisting of "Declarations Objecting to Points of Defendant's 'Introduction'" (pages 7-23), "Declarations Objecting to Points of Defendant's 'Factual Background'" (pages 23-34), "Declarations Objecting to Points of Defendant's 'Standard of Review'" (pages 35-36), and "Declarations Objecting to Points of Defendant's 'Argument'" (pages 36-42). For convenience, the court refers to plaintiff's opposition, regardless of section or declaration, by page number.

[3] The court DENIES Plaintiff's Motion for Leave of the Court to Permit Plaintiff to Provide Further Briefing on Defendant's Motion to Dismiss, ECF No. 17, and treats the document instead as her Surreply.

which relief can be granted. Because she does adequately allege a retaliation claim, the court GRANTS Howard's motion to dismiss in part and DENIES it in part.

## I. BACKGROUND

### A. Family Medicine Residency Program

Howard offers postgraduate training to medical residents, the standards for which the Accreditation Council for Graduate Medical Education ("ACGME") establishes. Def.'s Mem. at 3; *see* Compl ¶ 11. One such training program is Howard's Family Medicine Residency Program. "[R]esidents are to learn through experiential training, informal feedback, coaching and counseling meetings, written evaluations . . . , and through formal summative feedback, which is known as Milestones Evaluations/Biannual Program Director's Meeting." Compl. ¶ 11. A resident must achieve "competency in: professionalism; and interpersonal and communication skills," among other areas. Def.'s Mem. at 3; *see id.*, Ex. 1 at 1.

The American Board of Family Medicine ("ABFM") sets the standards for residents in the Family Medicine Department, Def.'s Mem. at 3, among which is a strict attendance requirement:

> Residents are expected to perform their duties as resident physicians for a minimum period of eleven months each calendar year. Therefore, absence from the program for vacation, illness, personal business, leave, etc. must not exceed a combined total of one (1) month per academic year. The ABFM defines one month as 21 working days or 30 calendar days[.] Absence from residency education, in excess of one month within the academic year (G-1, G-2 or G-3 year) must be made up before the resident advances to the next training level, and the time must be added to the projected date of completion of the required 36 months of training.

Compl. ¶ 48 (emphasis removed). "There is no carve-out in the ABFM guidelines for a resident's absent days relating to any alleged infirmity, illness or disability." Def.'s Mem. at 4.

The Howard University Employee Handbook ("Handbook") sets forth the "internal policies outlining the terms and conditions of employment at Howard," including "progressive discipline," *id*., starting with a supervisor's informal counseling of an employee whose performance, conduct or attendance shows "early signs of problems," *id*., Ex. 2 (Handbook Sec. 12.01); Compl. ¶ 13.[4]  If informal counseling is ineffective, the Handbook calls for formal disciplinary action in four steps: Letter of Admonition; Letter of Warning and Performance Improvement Plan (PIP); a Final Warning; and Termination.  *See* Def.'s' Mem., Ex. 2 (Handbook Sec. 12.02).  Notwithstanding these provisions, Howard "reserves the right to omit any or all of the levels of discipline depending on the severity of the offense."  *Id*., Ex. 2 (Handbook Sec. 12.00).

Plaintiff joined Howard's Family Medicine Residency Program on July 1, 2016, as a second-year resident.  Compl. ¶ 1.  She "was the only Caucasian, Jewish American female in the . . . program" at that time.  *Id*. ¶ 2.  Plaintiff's supervisors included three chief residents (two African born males and one Asian male).  *Id*. ¶ 7.  Her direct supervisor was Dr. Oladunni Filani (African born male), Director of the Family Medicine Program.  *Id*.; Def.'s Mem. at 5.  Dr. Mark Johnson (African American male) was the Chair of the Family Medicine Department, Compl. ¶ 7; Def.'s Mem. at 5, and Plaintiff's academic advisor, Compl. ¶ 35.

Based on Plaintiff's "competency evaluations as well as [her] performance in the ambulatory clinic, inpatient services, and operating/procedure rooms," Def.'s Mem., Ex. 3, she

---

[4]  Howard provides copies of documents Plaintiff specifically references in her Complaint, and the court's consideration of them does not require it to convert Howard's motion to dismiss into a motion for summary judgment.  *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015).

met "the requirements to advance to the next . . . level of training within the Department of Community and Family Medicine," *id.*, Ex. 3.  By memorandum dated January 27, 2017, Dr. Filani notified Plaintiff of Howard's "intention to renew [her] Post Graduate Training contract for the 2017-2018 academic training year beginning July 1, 2017."  *Id.*, Ex. 3; Compl. ¶ 3. Renewal was "contingent upon [her] continued demonstration of professional and medical competence and the successful completion of the [2016-17] academic year."  Def.'s Mem., Ex. 3.

### B. Orientation, Holidays and Meetings

Plaintiff claims to have been singled out from the beginning.  She alleges she was not given "[i]mportant information regarding orientation activities and onboarding communications/materials," Compl. ¶ 8, and was given "an expired and invalid meal ticket for the July 2016 orientation," *id.* ¶ 9.  She allegedly was excluded from Christmas holiday events, *id.*, and denied "[an] opportunity to attend resident events, such as the welcome of new hires event in July 2016, as [she] was intentionally put on call duty when these events were scheduled," *id.*  Plaintiff alleges that she was subjected to "hateful comments" about "Americans, the American government, LGBT community, the Washington, DC African American community, and other disenfranchised groups."  *Id.* ¶ 10.  And she "was not accommodated for time off to observe high holy Jewish observances," *id.*, while directed "to work the Christian holiday of Christmas because [she is] Jewish," *id.*

### C. Sharps Injury

"On September 30, 2016, [Plaintiff] suffered a needle stick injury and bodily fluid exposure while assisting the Obstetrics and Gynecology Attending Physician . . . in post-vaginal delivery surgical repair."  *Id.* ¶ 52.  The attending physician allegedly instructed Plaintiff to use

her hands instead of a retractor, and while sewing stitches on a patient with a venereal disease, he stuck Plaintiff's finger. *See id.* ¶¶ 52-53, 59. Plaintiff therefore had to take blood tests for HIV and hepatitis, and retesting over the following 12 months allegedly "caused [her] physical and emotional distress and anguish." *Id.* ¶ 59.

Plaintiff claims that this incident was an example of Howard's "frighteningly sloppy procedures," *id.* ¶ 53, and she faulted Howard's investigation of the incident as a "cover up for the fact that [it has] lax cross-contamination policies creating a serious potential hazard for the Hospital," *id.* ¶ 56. Following the incident, Howard allegedly shared information in Plaintiff's medical records without authorization, *id.*, and "penalized [her] for taking necessary time off to tend to the medical needs [its] negligence posed," *id.* ¶ 58.

Plaintiff alleges that, on October 11, 2016, Dr. Filani "summoned [her] to a meeting to discuss the sharps incident." *Id.* ¶ 60. The meeting allegedly "turned into an interrogation," *id.*, during which Dr. Filani expressed his disbelief at Plaintiff's account of the event. *Id.* Plaintiff also alleges that Dr. Filani "provided insulting and negative feedback stating that he or others are 'walking on eggshells' around [her]." *Id.*

### D. Didactics Meetings

Plaintiff alleges that there was a mandatory didactics meeting for all residents on Wednesday mornings. Pl.'s Opp'n, Ex. 31 at 1. On November 9, 2016, Dr. Filani scheduled meetings at 10 a.m. and 11 a.m., and Plaintiff did not attend either meeting, choosing "to only show up for call that afternoon." *Id.*, Ex. 31 at 1-2.

According to Plaintiff, Dr. Filani "singled [her] out" by emailing her on November 9, 2016 regarding her failure to attend these meetings, despite the fact that other residents had also not attended. Compl. ¶ 15; *see* Pl.'s Opp'n, Ex. 31 at 2. She responded "in great detail that notice of the meeting was unclear and given at . . . short notice." Compl. ¶ 15. She "was not aware of the meeting and so [she] was not there." Pl.'s Opp'n, Ex. 31 at 2. She asked Dr. Filani to send her "detailed minutes" of the meeting. *Id.*, Ex. 31 at 2. Dr. Filani found Plaintiff's explanation "unprofessional" and told Plaintiff it was her "responsibility to find out what was discussed not to request minutes to be sent[.]" *Id.*, Ex. 31 at 1. Dr. Filani "[s]ubsequently . . . sent a written warning to *all* of the residents noting that a "few" residents had not attended the meeting." Compl. ¶ 15 (emphasis in original); *see* Pl.'s Opp'n, Ex. 32.

### E. Encounter with Dr. Johnson

Plaintiff claims that on December 8, 2016, she had "an extremely uncomfortable awkward interaction with . . . Dr. Mark Johnson." Compl. ¶ 35. When Dr. Johnson "was made the Department head, [Plaintiff] and several others congratulated him by extending a hand for a simple formal professional handshake." *Id.* Rather than shake Plaintiff's hand, Dr. Johnson allegedly "pulled [her] close to him, chest to chest in a bear hug wrapping his arms around [her] in an overly intimate gesture." *Id.* Plaintiff "was shocked, stunned and taken aback," finding the gesture "extremely unprofessional and unwelcome[.]" *Id.* Thereafter, she avoided any private meeting with Dr. Johnson. *Id.*

Plaintiff filed a complaint by email regarding the encounter with Dr. Johnson on March 30, 2017, to the attention of "HR Specialist." Pl.'s Opp'n, Ex. 4 at 1-2; *see* Compl. ¶ 35. Dr. Antwan-La'Mont Lofton, Director, Employee Relations & Equal Employment Opportunity at

Howard's Office of Human Resources, acknowledged receipt of the email on that same date. Pl.'s Opp'n, Ex. 4 at 1.

### F. Dr. Kolko and La Clínica

On February 1, 2017, Dr. Joshua Kolko at La Clínica del Pueblo, a maternity care clinic, received a telephone call from a prenatal patient whose condition warranted hospital admission. *See* Def.'s Mem., Ex. 4 at 1. Dr. Kolko instructed his patient to proceed directly to Howard University Hospital, and he contacted Plaintiff, the family medical resident on call, to relay the patient's information. *Id.*, Ex. 4 at 1; Compl. ¶ 17. Plaintiff alleges that she "appropriately triaged and admitted the patient" and "contacted Dr. Somwaru, the resident responsible for this . . . patient." Compl. ¶ 17. Dr. Somwaru allegedly "refused to attend [the] birth despite being the responsible resident and being told by the chief resident Dr. DeMata to do so." *Id.*; *see id.* ¶ 18.

Dr. Kolko emailed Dr. Filani on February 23, 2017, and told him that during the February 1, 2017 call with Plaintiff, she informed him that "she would not be involved in deliveries[.]" Def.'s Mem., Ex. 4 at 1; *see* Compl. ¶ 18. Dr. Kolko also told Dr. Filani that in addition to Plaintiff's alleged refusal to tend to the patient, Plaintiff had been absent from her clinic rotation on December 1, 2016 and December 15, 2016. Def.'s Mem., Ex. 4 at 1-2; *see id.*, Ex. 7 at 1.[5]

---

[5] Plaintiff includes an exhibit which suggests that she declined to attend to a patient on a prior occasion. An email message to Dr. Filani from Dr. Karama, a resident on call, states:

> On the evening of Sunday, December 4th, 2016, the senior resident on call called Dr. Shapiro whose name was on the patient card as the secondary resident responsible for the patient in labor. She replied that she could not come in because "she was not aware that she was the secondary resident for the patient and that she had finished her 10 continuity patients". The resident on call thus had to take responsibility for the patient because the primary resident was on vacation.

On or about April 12, 2017, Plaintiff spoke to Dr. Kolko about the February 1, 2017 incident. Compl. ¶ 19. She then sent him a follow up email on April 13, 2017, in which she again asserted that it was Dr. Somwaru who was responsible for the patient, and denied having "missed or skipped . . . a delivery assigned to [her]." Pl.'s Opp'n, Ex. 16. She also claimed that Dr. Kolko "misinterpreted [their] conversation and relayed misinformation to the Howard FM Residency Program," and she told Dr. Kolko that he "should have talked to [her] before [he] made the erroneous and slanderous written statements." *Id*., Ex. 16. She asked Dr. Kolko "to . . . correct [his] statements . . . and rectify these matters." *Id*., Ex. 16.

### G. Intern Chat Room

In February 2017, Plaintiff learned that the interns "had a chat room on a cyber communications application[] where they would talk about [her]." Compl. ¶ 24. She claims that "[m]anagement set up a smear campaign on a cyber chat board," Pl.'s Opp'n at 31, where plaintiff's "subordinates/interns . . . started maligning [her] on this cyber application weirdly," *id*. None of the interns "talked to [her] while on duty . . . or at any time about any alleged concerns about [her] supervisory role." Compl. ¶ 26. Instead, according to Plaintiff, the interns "collaborated on writing a letter to launch allegations against [her]." *Id*. ¶ 25; *see* Pl.'s Opp'n at 32. Plaintiff considered herself "bullied and cyber-bullied, and subject to hostility[.]" Compl. ¶ 26, *see* Pl.'s Opp'n at 31-33.

---

Pl.'s Opp'n, Ex. 13. Plaintiff deems Dr. Karama's assertion "second and third-hand hearsay," *id*. at 16, denies having received this phone call, and asserts that she "did not and could not have declined a delivery of which [she] was unaware," *id*. at 17.

**H. Online Exam**

In late February 2017, "residents sat for an in-person exam held through a testing vendor's online website." Compl. ¶ 20. "Dr. Filani proctored the exam in person." *Id*. Plaintiff claims that Dr. Filani was unable to score most of the exams because he was under the misimpression that the residents' answers had not been recorded. Pl.'s Opp'n, Ex. 10 at 2. Dr. Filani told the residents to retake the exam," Compl. ¶ 20, and he set the test "in tutor mode [to] give [the residents] immediate feedback," Pl.'s Opp'n, Ex. 10 at 1. He explained that "[t]he essence of the test is not just . . . scores but also the avenue to provide quick study material on topics . . . covered in the Board review series." *Id*., Ex. 10 at 1.

Plaintiff contacted the vendor's representative who allegedly "refuted Dr. Filani's claim that the exam results were lost." Compl. ¶ 21; *see* Pl.'s Opp'n, Ex. 10 at 1. She "learned that the results were safely stored at the vendor's site." Compl. ¶ 21. Plaintiff concluded that it was unnecessary to retake the exam, and communicated this to her colleagues via email:

> [A]ll 11 exams taken for FMRESIDENTS classroom activity on 2/22/17 went through and have associated scores. The company actually guarantees that scores are recorded even when the proctor closes the browser or computer! If you took the test on this past Wednesday, the company has every score report in their system. The company says there is no need for a retake if you took it already when it was proctored this past Wednesday. Good news!

Pl.'s Opp'n, Ex. 10 at 1-2.

Plaintiff claims that Dr. Filani responded in an email in which he accused her of "instructing the other residents to disregard his instructions." Compl. ¶ 22. Dr. Filani's email to Plaintiff stated:

> On Weds 02/22/2017 I arranged a quarterly test for the residents which you took and completed. I sent instructions to all the residents

> informing them of an error with my computer system that made it difficult for me to score them and asked that the test be taken again
> . . . .
> As of Friday 02/24/2017 I had already become aware that the test scores were available but decided to allow a revision for the residents by changing the mode of the test to allow for immediate feedback. Thus I chose not to change the directive that I had given to the residents.
> I would like an explanation for why you felt it was appropriate and necessary for you to give instructions to residents not to take the test anymore thereby contradicting my earlier given directive.

Pl.'s Opp'n, Ex. 11 at 1-2. Plaintiff deemed Dr. Filani's accusation "false and ludicrous," Compl. ¶ 22, and considered his "reaction and manner in which he rebuked [her] uncalled for," *id*. She felt that she had been "singled out for insubordination, and [was] compelled to respond," Pl.'s Opp'n at 15, by email on March 2, 2017, in which she denied giving her fellow residents instructions or contradicting Dr. Filani's instructions, of which she claimed to be unaware. *See id*., Ex. 11 at 1.

### I. Meeting with Dr. Lofton

Plaintiff met with Dr. Lofton on March 9, 2017 and "raised many concerns about mistreatment, differential treatment, and retaliation." Compl. ¶ 30. She claims that Dr. Lofton "assessed that [she] was 'in a hostile work environment," *id*., and "recommended . . . 'interim remedial action,'" *id.* Although he was to meet with Plaintiff again, he "made himself unavailable" when she contacted him after receiving a Formal Warning on March 9, 2017. *Id.*; *see* Pl.'s Opp'n, Ex. 34.

### J. Formal Warning

On March 9, 2017, shortly after her meeting with Dr. Lofton, Plaintiff received a Formal Warning from Dr. Johnson by email. Compl. ¶¶ 30, 12; *see* Pl.'s Opp'n, Ex. 12 at 2. Dr. Johnson's letter noted Plaintiff's "refusals to complete . . . work assignments, insubordination,

and failure to adhere to program requirements concerning work assignments for interns." Pl.'s Opp'n, Ex. 12 at 2. He cited the following conduct:

> [R]efusing legitimate instructions to complete assignment at La Clínica; informing La Clínica that [she would] no longer be accepting Obstetric patient assignments at that facility nor caring for patients in the Labor and Delivery suite at the Hospital; instructing interns to report to the Labor and Delivery suite; and failing to provide proper oversight of interns assigned to [her], which poses a potential risk to patient safety.

*Id.*, Ex. 12 at 2. Dr. Johnson reminded Plaintiff of her obligation "to be present at all assignments and [to] complete all work as assigned by the Program Director." *Id.*, Ex. 12 at 2. Invoking "the requirements of the Family Medicine Program, the House Staff Manual, and the applicable provisions of the [collective bargaining agreement] covering the residents," Dr. Johnson advised Plaintiff that she "may not refuse legitimate work instructions and assignments related to [her] training and performance in the Residency Program[.]" *Id.*, Ex. 12 at 2. He warned her that "[f]urther refusals to complete . . . work assignments, insubordination, instructing interns to report to Labor and Delivery, and failure to appropriately oversee the interns assigned to [her] may result in further disciplinary action up to and including termination from the Residency Program." *Id.*, Ex. 12 at 2. Plaintiff expressed her surprise at the Formal Warning in a lengthy email to Dr. Johnson, in which she denied the conduct charged. *See id.*, Ex. 12 at 1. She denied having told doctors at La Clínica that she would not accept patients, reiterated that Dr. Somwaru was responsible for the patient, and declared that she had "not missed or skipped on a delivery assigned to [her] or sent an intern in [her] place." *Id.*, Ex. 12 at 1.

**K. Meet the Cabinet Event**

On March 29, 2017, Plaintiff attended Howard's Meet the Cabinet, "an open forum for addressing questions and concerns to Cabinet members, including the University Provost and Director of [Human Resources.]" Compl. ¶ 31. Plaintiff addressed the panel and informed them about "an ongoing issue in the Hospital." *Id*. The panel members indicated that they would discuss the issue with her at a reception after the event, but Plaintiff did not attend the reception because she was "cornered," by staff from Howard's General Counsel office. *Id*. She claims that she was warned that "things were 'underway' and 'in the works.'" *Id*. ¶ 32. The staff said they could not "protect [Plaintiff] from what is normal," and "affirmed, 'the fact that you made a complaint does not protect you from what is normal.'" *Id*.

**L. Program Director's Meeting**

Each resident was expected to meet with the Program Director "to review interval and summative performance evaluations." *Id*. ¶ 27; *see* Pl.'s Opp'n, Ex. 2 at 1. Other residents met with Dr. Filani either in December 2016 or January 2017. Compl. ¶ 27. Plaintiff's meeting was to have occurred on February 14, 2017, Pl.'s Opp'n, Ex. 7 at 1, but it "was cancelled with little notice . . . and with no alternative date set," Compl. ¶ 27; *see id*. ¶ 29. There was "no legitimate reason" given for the cancellation. *Id*. ¶ 27. When the meeting finally took place, Plaintiff was scheduled to meet with Dr. Johnson, not Dr. Filani. *Id*. ¶¶ 28, 37-38.

Plaintiff "was concerned about meeting with Dr. Johnson and reached out to [her] union representative," who told Plaintiff to ask that the union representative attend the meeting. *Id*. ¶¶ 41-42. In response to Plaintiff's request, Dr. Johnson replied by email on April 6, 2017:

> Generally speaking, you may not refuse to receive your performance appraisal or to attend a meeting that is for the sole purpose of delivering your performance appraisal (which covers the review period of July 1, 2016 through December 12, 2016) and reviewing performance expectations with you . . . .
>
> If you are requesting to have a union representative present during your performance appraisal meeting, your request is granted. Since, as I understand, there is currently no union steward onsite at the hospital, the current union representative, Ms. Cynthia Martinez, may attend the meeting in-person or by phone. Accordingly, I will postpone the meeting until tomorrow, Friday, April 7, 2017 at 11:00 a.m., to allow time to make . . . arrangements for Ms. Martinez to attend the meeting . . . .

Pl.'s Opp'n, Ex. 5 at 2.

Plaintiff contacted Dr. Lofton the same day. *Id.*, Ex. 5 at 1. She expressed her discomfort with meeting with Dr. Johnson because she had filed a complaint against him that remained pending. *Id.*, Ex. 5 at 1. She suggested that a "fair and reasonable step would be to reassign [her] an alternate advisor," *id.*, or to have another faculty member conduct the meeting. Compl. ¶ 43. She asked Dr. Lofton to cancel the meeting and provide her with "a more appropriate academic advisor[.]" Pl.'s Opp'n, Ex. 5 at 1. Dr. Lofton responded:

> The residency program is required to evaluate your performance every 6 months. As you have noted, you have not received your evaluation for the June to December performance. The mid-year meeting was delayed due to concerns you raised about Dr. Filani, but cannot be further delayed.
>
> I have confirmed that your union representative has been contacted, and has agreed to attend the meeting by phone . . . .
>
> While some accommodation has been made due to your concerns, the meeting must go forward tomorrow, and you are expected to attend.

*Id.*, Ex. 7 at 1-2.

Plaintiff reported to Dr. Johnson's office for the meeting on April 7, 2017, and "was escorted into a conference room where . . . Dr. Filani and Dr. Goodwin, an HR executive" awaited her arrival. Compl. ¶ 44. Plaintiff alleges that Dr. Filani did not address her directly; instead he spoke to her union representative on the phone and read from what appears to be her Resident Milestone Evaluation: Mid-Year 2016-2017, *see generally* Pl.'s Opp'n, Ex. 9, covering Plaintiff's performance for the first six months of her residency, *id*., Ex. 7 at 1; *see id*., Ex. 5 at 2. "[T]he review was satisfactory, and on a scale of 5, [Plaintiff] scored a level of 2 to 4 on competencies." *Id*. at 15. Plaintiff claims that Dr. Filani provided no feedback and did not express any concern with Plaintiff's performance or professionalism, and refused to answer her questions about "why [she] was . . . treated different[ly] than any of the other residents when it came to scheduling and executing this meeting," before he left the conference room. Compl. ¶ 45. Dr. Goodwin also refused to provide Plaintiff an explanation, saying that he was there as an observer. *Id.*

### M. Plaintiff's Absences

By letter dated April 12, 2017, Dr. Filani notified Plaintiff that her absences, which totaled 22 work days and 26 calendar days, exceeded the maximum number of absences permitted by ABFM. Def.'s Mem., Ex. 7 at 1; *see* Compl. ¶ 46. A second letter dated April 13, 2017 revised the count: Plaintiff's then-current and planned absences totaled 27 work days and 33 calendar days. Def.'s Mem., Ex. 8. Dr. Filani warned:

> Please know that based on the ABFM's rules, "absence from the residency education in excess of one month within the academic year . . . must be made up before the resident advances to the next training level, and *the time must be added to the projected date of completion of the required 36 months of training*."

*Id*., Ex. 7 at 1 (emphasis added); *see id*., Ex. 8; Compl. ¶¶ 47-48.

According to Plaintiff, her contract provided for 13 sick days, 12 of which she had used. Compl. ¶ 46. She took additional "sick leave after [the sharps] injury at the end of September 2016, and two of those days were spent in the doctor's office in order to obtain notes at Dr. Filani's request." *Id.*; *see id.* ¶¶ 52-53. In March 2017, when Plaintiff's shoulder was in a sling, she used one day of sick leave "at [Dr.] Filani's request to obtain a note on the recommendations regarding a shoulder sling." *Id.* ¶ 46. Plaintiff also claims she had obtained approval to use annual leave from October 14, 2016 through October 20, 2016, and from April 14, 2017 through April 27, 2017. *Id.* By her calculation, she would have been "absent for a total of 33 calendar days, a difference of only 3 days, which could have been added to the 36 months of required training." *Id.* ¶ 49 (emphasis in original). Plaintiff alleges that although adjustments of this kind had been granted to other residents "for causes including FMLA leave, bereavement, sick leave[and] academic failures," she was not offered the option of extending her completion date, *see id.* ¶¶ 50, 64. Plaintiff also notes that Dr. Filani did not "mention any concerns regarding alleged absenteeism" during the April 7, 2017 review meeting. *Id.* ¶ 50.

### N. Plaintiff's Disability

Plaintiff alleges she has Sjorgen's SLE, a "chronic autoimmune disorder." Pl.'s Opp'n at 21; Compl. ¶ 81. She claims that the sharps injury she sustained on September 30, 2016 aggravated her condition and required her to take time off from work. Compl. ¶¶ 52, 61. Her physician, Dr. Richard A. Wilson, Jr., recommended she receive "two or three days off." Pl.'s Opp'n, Ex. 21.[6] According to Dr. Wilson's prescription dated October 6, 2016, Plaintiff was

---

[6] Dr. Wilson's note on September 9, 2016, precedes the date of Plaintiff's sharps injury, September 30, 2016. The court presumes that the date on the note is in error, particularly in light of Dr. Wilson's prescription, *see* Pl.'s Opp'n, Ex. 22, which indicates that he saw Plaintiff on October 6, 2016.

allowed to return to work on October 7, 2016. *See id.*, Ex. 22. Dr. Wilson noted that Plaintiff

had not completely recovered and needed assistance. *Id.*, Ex. 22. Plaintiff claims she requested

reasonable accommodation, although she does not describe the accommodation she sought.

Comp. ¶ 61. Plaintiff was absent on October 3-6, 2016, October 4, the four business days

following the September 30, 2016 sharps incident. Def.'s Mem., Ex. 7 at 1.

On March 31, 2017, while Plaintiff was wearing a shoulder sling, she emailed Dr. Filani

to confirm whether she had call duty the following day. Pl.'s Opp'n, Ex. 20. Dr. Filani

responded:

> [W]hen on call you must be able to care for, and treat patients, to
> deliver babies, and to be able to respond in the event of an
> emergency. Based on your sling, we have concerns about your
> ability to do all of these things. Until this issue is resolved, you are
> excused from call.

*Id.*, Ex. 20. Plaintiff alleges that although she was relieved of call duty, she remained on duty for

the clinic, which was "busy and . . . usually more demanding than the hospital." Compl. ¶ 63.

She claims that Dr. Filani removed her from call duty "without consulting [her] or offering a

more reasonable accommodation[.]" *Id.* She does not state what accommodation would have

been more reasonable.

**O. Probation**

Defendant claims that concerns arose "regarding [Plaintiff's] academic progress since

December 2016." Def.'s Mem., Ex. 1 at 1. The Clinical Competency Committee found that,

between December 1, 2016 and April 21, 2017, Plaintiff "demonstrated serious deficiencies in . .

. two Family Medicine milestone competencies established by [ACGME]: (1) Professionalism;

and (2) Interpersonal and Communication Skills." *Id.*, Ex. 1 at 1. For example, Plaintiff showed

a lack of "professional conduct and accountability" because she "[r]epeatedly refused to complete . . . training and/or work assignments," "[f]ailed to demonstrate insight into [her] own behavior and triggers for professionalism lapses," and "[f]ailed to demonstrate a satisfactory level of training and participation in the program because of [her] excessive absenteeism." *Id.*, Ex. 1 at 1.

The Committee found that Plaintiff exhibited "[p]oor decision making in the management of patients in the clinical setting" when, for example, she "[r]efused to care for La Clínica patients" and "[c]ancelled numerous clinical sessions without regard for patients' care." *Id.*, Ex. 1 at 2. In addition, the Committee noted Plaintiff's inability to communicate in a professional, respectful and effective manner with other doctors and health care professionals, and cited her "bullying and harassing communications with the interns on [her] team and a supervising physician at La Clínica." *Id.*, Ex. 1 at 2. Lastly, the Committee deemed Plaintiff unable "to communicate collaboratively with the health care team by listening attentively, sharing information, and giving and receiving constructive feedback," particularly when she "directed hostile and harassing conduct towards the interns, engaged with a physician at La Clínica in a threatening manner, and . . . consistently responded to constructive feedback from the Program Director and other members of [her] healthcare teams in a hostile and threatening manner." *Id.*, Ex. 1 at 2.

On behalf of the Clinical Competency Committee, Dr. Filani notified Plaintiff by letter dated April 26, 2017, that she was to be placed on probation and that she would receive a 30-day performance plan. *See* Compl. ¶ 16; *see generally* Def.'s Mem., Ex. 1. Dr. Filani scheduled a meeting for April 28, 2017 "to discuss the deficient areas [the Committee] identified . . . , to provide [Plaintiff a] performance plan, and to provide [her] the opportunity to ask questions."

Def.'s Mem., Ex. 1 at 2. While on probation, Plaintiff was to "be evaluated and supervised in in-patient and out-patient clinics and other clinical learning environments," and her progress was to be assessed over a 30-day period. *Id.*, Ex. 1 at 2. Dr. Filani warned that Plaintiff's failure to complete the performance plan "in a satisfactory manner or failure to otherwise meet the ACGME competency standards to progress to the next year in the Residency Program may result in termination from the Residency Program." *Id.*, Ex. 1 at 3.

According to Plaintiff, "probations are considered serious actions and are reported to state medical boards and accreditation boards[.]" Compl. ¶ 71. She did not complete the second year of her residency. That fact, together with her probationary status, allegedly make her ineligible for, or a less desirable candidate for, another residency program. *See id.*; *see id.* at 6 (alleging "[i]nability to secure [comparable employment] due to the defamation in [her] file").

**P. Plaintiff's Resignation**

Plaintiff describes the Clinical Competency Committee's complaints about her performance as "bogus." Compl. ¶ 69. She asserts that the performance improvement plan "was designed by [Howard] to have [her] fail and falsely validate termination." *Id.* Plaintiff felt as if she "was effectively forced out." *Id.* ¶ 70. Although she submitted a letter of resignation on May 2, 2017, she maintains that her resignation was involuntary, *see* Pl.'s Opp'n at 7, 33.[7]

Plaintiff alleges that her "medical career is derailed" and that "[n]o residency program in the Washington area or otherwise would [accept her]" because programs generally do not accept

---

[7] It appears that Plaintiff consulted counsel who told her that Howard would revoke probation if she resigned. *See* Compl. ¶ 70; Pl.'s Opp'n at 33-34. Therefore, she claims, hers "was a forced resignation." Pl.'s Opp'n at 34.

a resident just for her third year.  Compl. ¶ 71.  According to Plaintiff, Howard has "prevented [her] from moving on in [her] career for the foreseeable future," causing her to lose wages and future earnings.  *See id.*; *see also id.* at 6.

### Q. Plaintiff's Title VII and ADA Claims

Plaintiff filed this action on November 9, 2018, alleging discrimination based on her race, gender, religion and national origin in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII").  *See* Compl. ¶¶ 75-76.  Plaintiff also alleges retaliation under Title VII for having opposed or complained about Howard's discrimination against her.  *Id.* ¶ 78.  Her final claim purports to fall under the Americans with Disabilities Act ("ADA"), for Howard's alleged "fail[ure] to provide reasonable accommodation for [her] disabilities (autoimmune conditions)[.]"  *Id.* ¶ 81.  Although the Complaint does not set forth separate counts for constructive discharge and hostile work environment, a liberal reading of the Complaint compels the court to consider these claims as well.  Plaintiff seeks a declaratory judgment and monetary damages.  *See generally id.* ¶ 84.  She also seeks injunctive relief in the form of "a letter of recommendation and letter of apology."  *Id.* at 6.

## II. DISCUSSION

### A.  Dismissal Under Rule 12(b)(6)

Howard moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that it fails to state a claim upon which relief can be granted.  Specifically, Howard contends that Plaintiff neither has "plead a plausible *prima facie* case of discrimination or retaliation" under Title VII, nor has "plead a disability under the ADA."  Def.'s Mem. at 13, 19.

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim tests the legal sufficiency of a complaint. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is plausible when the factual content allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, although a plaintiff may survive a Rule 12(b)(6) motion even where "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56 (internal quotation marks omitted).

"Courts in this Circuit 'have consistently recognized the ease with which a plaintiff claiming employment discrimination can survive . . . a motion to dismiss[.]'" *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 86 (D.D.C. 2016) (quoting *Fennell v. AARP*, 770 F. Supp. 2d 118, 127 (D.D.C. 2011)). A plaintiff need not "plead every fact necessary to establish a prima facie case to survive a motion to dismiss." *Jones v. Air Line Pilots Ass'n, Int'l*, 642 F.3d 1100, 1104 (D.C. Cir. 2011) (citation omitted); *see Farrar v. Wilkie*, No. 18-cv-1585, 2019 WL 3037869, at *2 (D.D.C. July 11, 2019) (citing *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161-62 (D.C. Cir. 2015)). Still, a plaintiff must allege sufficient facts "about 'what . . . [,] who . . . [,] and how' that make such a claim plausible." *Id.* (quoting *Arnold v. Speer*, 251 F. Supp. 3d 269, 273 (D.D.C. 2017) (brackets and ellipses in original); *see Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015) ("While a plaintiff need not plead a *prima facie* case at this stage, he must nonetheless allege facts that if accepted as true would make his discrimination claims plausible.").

The court presumes the truth of a plaintiff's factual allegations, *see Iqbal*, 556 U.S. at 679, and construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted).  The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678; *see Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (the court "do[es] not accept as true . . . the plaintiff's legal conclusions or inferences that are unsupported by the facts alleged.").

### B. Plaintiff's Title VII Claims

Title VII makes it "an unlawful employment practice for an employer . . .  to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race, color, religion, sex or national origin[.]"  42 U.S.C. § 2000e–2(a).   Title VII also makes it "an unlawful employment practice for an employer to discriminate against any . . . employee[] . . . because [she] has opposed any practice made an unlawful employment practice . . . or because [she] has made a charge" of discrimination[.]"  42 U.S.C. § 2000e-3(a).  Its "protections . . . apply to minority and nonminority employees alike."  *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006).

#### 1. Disparate Treatment

"[A] plaintiff . . . state[s] a prima facie claim of discrimination by establishing that: '(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'"  *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)); *see Brady v. Office of Sergeant at Arms,* 520 F.3d 490, 493 (D.C. Cir. 2008) (noting that Title VII "establishes

two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin").

Howard does not dispute that Plaintiff is a member of a protected class. It argues that she "does not plead a plausible claim of disparate treatment discrimination as Howard took no adverse employment action against her." Def.'s Mem. at 16.

Ordinarily, an adverse action means "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)). However, "[a]ctions short of an outright firing can be adverse within the meaning of Title VII, but not all lesser actions by employers count." *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002). "For employment actions that do not obviously result in a significant change in employment status – such as giving a poor performance evaluation, reassigning office space and equipment, or, for that matter, fielding a company softball team – an employee must go the further step of demonstrating how the decision nonetheless caused such an objectively tangible harm." *Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009). And for an adverse employment action to be taken "because of" a plaintiff's protected status, "discrimination must be a motivating factor in, but need not be the but-for cause of, [the] adverse employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 370 (2013).

Plaintiff claims that Howard took the following adverse actions:

> (1) failing to provide feedback, evaluations, and summative in-person performance reviews, resorting to formal disciplinary measures;

23

(2) having Dr. Johnson convene her Program Director's Meeting

(2) issuing a Formal Warning on March 9, 2017

(3) placing her on probation on April 26, 2017

(4) issuing a warning about her absences from the program

*See* Compl. ¶ 12; Pl.'s Opp'n at 2, 4, 12-14, 31, 38.  However, the court finds that only one of these actions may qualify as an adverse action.

### a. Program Director's Meeting

The court assumes that Plaintiff's references to feedback, evaluations and performance reviews pertain to the April 7, 2017 Program Director's Meeting.  Plaintiff alleges that Dr. Johnson scheduled her meeting three or four months after her fellow residents had their meetings with Dr. Filani, the Residency Program Director.  But she further alleges that Dr. Filani attended the meeting and orally presented the evaluation of Plaintiff's performance for the first half of her second year of residency.

Missing from Plaintiff's submissions are any factual allegations to support a claim that the April 7, 2017 Program Director's Meeting, even if delayed and convened by Dr. Johnson, caused her some tangible harm, such as a change in employment status, pay or benefits.  Viewed in the light most favorable to Plaintiff, the facts indicate that she received what she demanded – a Program Director's Meeting with the Program Director – without any apparent negative consequence.

It appears that Plaintiff's dissatisfaction with the meeting, at least in part, arises from Dr. Filani's delivery and the issues he did not address.  She alleges that, "[a]t no time before, during or after the meeting did Dr. Filani bring up any concerns with [her] in person," Compl. ¶ 46,

regarding her absences from the program, *id.* ¶ 50, and asserts that the Program Director's Meeting would have been the appropriate forum in which to do so, *see* Pl.'s Opp'n at 15. She further complains that Dr. Filani "did not raise any concerns about [her] performance, professionalism, or provide any directed negative reports," or "provide [her] with any feedback whatsoever outside of what he read off a satisfactory milestone review." Compl. ¶ 45. But the Program Director's Meeting was a mid-year review covering only Plaintiff's performance from July 2016 through December 21, 2016, and Dr. Filani would not have been expected to raise any concerns about matters which occurred after the end of the review period.

### b. Formal Warning

The disciplinary measures to which Plaintiff was subjected include the March 9, 2017 Formal Warning "concerning [plaintiff's] refusals to complete . . . work assignments, insubordination, and failure to adhere to program requirements including work assignments for interns." Pl.'s Opp'n, Ex. 12 at 2. Plaintiff vehemently objects to the content of and articulated bases for the Warning, yet she alleges no facts suggesting that the Warning actually affected her employment status, pay or other condition or benefits of her employment. She proffers no facts tending to show that the Formal Warning, for example, resulted in lower pay or lost professional opportunities. *See Sims v. Sunovion Pharm., Inc.*, No. 17-cv-2519, 2019 WL 690343, at *7 (D.D.C. Feb. 19, 2019) (finding that plaintiff articulated an actionable adverse employment action by alleging facts connecting negative performance review and placement on performance improvement plan "to reduced opportunities to meet her quotas, reduced opportunities to compete for bonuses, and a material change in employment responsibilities based on a diminished customer base and sales territory"). Thus, absent any allegation of tangible harm, the court concludes that issuance of the Formal Warning was not an adverse employment action.

*See Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (concluding that letter of counseling, letter of reprimand and unsatisfactory performance review were not adverse employment actions); *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002) (noting that "formal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits do not constitute adverse employment actions"); *Ali v. District of Columbia Gov't*, 810 F. Supp. 2d 78, 86 (D.D.C. 2011) (finding that "criticism from a supervisor that does not affect a subordinate's employment status or opportunities is not adverse action"); *Kline v. Springer*, 602 F. Supp. 2d 234, 242 (D.D.C. 2009) (finding that a letter of reprimand was not an adverse employment action), *aff'd sub nom. Kline v. Berry*, 404 F. App'x 505 (D.C. Cir. 2010) (per curiam); *Runkle v. Gonzales*, 391 F. Supp. 2d 210, 225 (D.D.C. 2005) ("Formal letters of admonishment and disciplinary notices that have no effect on an employee's grade or salary level, job title, duties, benefits or work hours, for example, do not constitute adverse actions."). There is a "thick body of precedent [that] . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions." *Brown*, 199 F.3d at 458.

### c. Probation

Generally, probation alone does not amount to an adverse employment action where there are no factual allegations showing that probation caused a significant change in the terms of employment. *See Stewart v. Missouri Pac. R. Co.*, 121 F. App'x 558, 562-63 (5th Cir. 2005) (affirming district court's ruling that probation was not adverse employment action because it "did nothing to alter [the] employment status" of plaintiffs who "received the same pay and held the same job responsibilities"); *Ford v. Delta Air Lines, Inc.*, No. 18-cv-3196, 2019 WL 2524772, at *2 (D. Minn. June 19, 2019) (finding that plaintiff who "alleges no decrease in pay or seniority, deprivation of benefits, or change in schedule or responsibilities" for having been

put on probation did not adequately allege an adverse employment action); *Robinson-Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 16 (D.D.C. 2008), *aff'd,* 417 F. App'x 4 (D.C. Cir. 2011). Here, Plaintiff alleges that probation posed material harm, as it affected her ability to maintain or to secure employment in her chosen field. *See* Compl. ¶ 71. Liberally construing this *pro se* complaint, the court finds there are sufficient facts from which to infer that probation is an adverse action.

### d. Warnings Regarding Absences

In arguing that Dr. Filani's warning letters constituted adverse actions, Plaintiff points to "the fact that 2 warning letters were sent in quick succession" which she interpreted as a sign that Dr. Filani "went back twice to check [her] file again," "fishing" for information, Pl.'s Opp'n at 24, 33. Plaintiff argues that this "excessive supervision," amounted to disparate treatment, because "other similarly situated residents . . . got to make up their missed days without reprimand or probation." *Id.*; *see* Compl. ¶¶ 49-50. She also faults Howard for sending warnings about her absences without "provid[ing] any plan for making the dates up." Pl.'s Opp'n at 24.

Once again, Plaintiff alleges no facts to support her claim that the written warnings regarding her absences caused her some tangible harm. ABFM policy sets the upper limit for a resident's absences within an academic year, and Dr. Filani's warnings that Plaintiff was in danger of exceeding that limit is not an adverse action. If anything, the warnings could have worked in Plaintiff's favor. When Dr. Filani issued the warning letters in April 2017, Plaintiff's had not completed her second year of residency, and she had not yet taken the leave she planned from April 14, 2017 through April 27, 2017, *see* Compl. ¶ 46, or 10 work days and 14 calendar

days, *see* Def.'s Mem., Ex. 7 at 1. There remained time for Plaintiff to have reconsidered her previously approved leave in order to avoid exceeding the maximum absences permitted under ABFM guidelines.

### e. Inference of Discrimination

Plaintiff falters with respect to the third prong of a prima facie case: alleging facts supporting an inference of discrimination arising from the employment actions of which she complains. Plaintiff notes, for example, that other residents were not issued warnings about their absences and were "off cycle," meaning they were allowed to extend their program completion dates to make up absences, yet she was not offered this option. Compl. ¶ 49. But she alleges no facts connecting the warning letters to her race, gender, religion or national origin. Nor does she allege facts connecting Howard's actions with respect to the Program Director's Meeting, issuance of a Formal Warning, or placing her on probation to her membership in a protected class. At most, Plaintiff appears to rely solely on her status as the "only Caucasian, Jewish, American female" in the Family Medicine Residency Program, Compl. ¶ 2, but those characteristics alone cannot support a discrimination claim. *See Massaquoi v. District of Columbia*, 81 F. Supp. 3d 44, 49 (D.D.C. 2015) (stating that "it is not reasonable to infer that just because [plaintiff's supervisors] were of a different national origin . . . than the plaintiff, all disciplinary actions they took against the plaintiff were motivated by these differences.").

The court concludes that Plaintiff has failed to state a plausible disparate treatment claim because she has not identified an actionable adverse action motivated by her race, religion or national origin. "[N]ot everything that makes an employee unhappy is an actionable adverse action," *Baird v. Gotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011) (citation omitted).

2. <u>Retaliation</u>

"To establish a *prima facie* case of retaliation, a plaintiff must show '(1) that [s]he engaged in [a] statutorily protected activity; (2) that [s]he suffered a materially adverse action by h[er] employer; and (3) that a causal link connects the two.'" *Chambers v. District of Columbia*, 389 F. Supp. 3d 77, 91 (D.D.C. 2019) (brackets in original and emphasis removed) (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)) (additional citations omitted), *appeal docketed*, No. 19-7098 (D.C. Cir. Aug. 28, 2019). Howard argues that Plaintiff's retaliation claim fails for the same reason her disparate treatment discrimination fails – because it took no adverse action against her. *See* Def.'s Mem. at 17.

"What constitutes an adverse action in the discrimination context is different than what constitutes an adverse action in the retaliation context." *Jimenez v. McAleenan*, No. 17-cv-2731, 2019 WL 3935182, at *9 (D.D.C. Aug. 20, 2019) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "A retaliatory adverse action . . . encompasses a broader sweep of actions than those in a pure discrimination claim and may extend to harms that are not workplace-related or employment-related so long as a reasonable employee would have found the challenged action materially adverse." *Id*. (brackets, internal quotation marks and citations omitted). The test is whether "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (internal quotation marks and citations omitted). But an actionable retaliation claim is one "where an employer causes '*material* adversity,' not 'trivial harms.'" *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) (per curiam) (quoting *Burlington N.*, 548 U.S. at 68) (emphasis in original).

Plaintiff alleges that her March 30, 2017 HR complaint regarding her December 8, 2016 encounter with Dr. Johnson constituted protected activity, as did her March 9, 2017 meeting with Dr. Lofton, and in retaliation Howard took the following actions:

> (1) cancelling the Program Director's Meeting originally scheduled for February 14, 2017
>
> (2) having Dr. Johnson, not Dr. Filani, convene the Program Director's Meeting, despite the HR report Plaintiff made against him the preceding week
>
> (3) having Dr. Filani read from a template at the Program Director's Meeting
>
> (4) putting Plaintiff on probation
>
> (5) issuing Plaintiff a Formal Warning

*See* Compl. ¶¶ 37, 43, 45, 61, 65; Pl.'s Opp'n at 9-11, 13, 29.

The court agrees that Plaintiff's HR complaint about Dr. Johnson constituted protected activity. Given the events alleged to have occurred between the December 8, 2016 incident and the end of Plaintiff's residency on May 2, 2017, it is plausible that a reasonable employee in Plaintiff's position would have been dissuaded from engaging in protected activity had she known that she would not have her Program Director's Meeting with the Program Director, or that the supervisor against whom she made a complaint would conduct her Program Director's Meeting, or that discipline would follow. Plaintiff reasonably could find these actions materially adverse. Construing Plaintiff's *pro se* complaint liberally and considering "the ease with which a plaintiff claiming employment discrimination can survive a Rule 12(b)(6) motion," *Rouse v. Berry*, 680 F. Supp. 2d 233, 236 (D.D.C. 2010), the court finds that Plaintiff states a facially plausible retaliation claim.

### 3. Hostile Work Environment

A hostile work environment is a "workplace . . . permeated with 'discriminatory intimidation, ridicule and insult,' that is 'sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). The standard is an objective one. *See Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Harris*, 510 U.S. at 21. Such claims are "usually characterized by a series of events that cumulatively give rise to a claim, although each individual component might not be actionable on its own." *Craig v. District of Columbia*, 881 F. Supp. 2d 26, 32 (D.D.C. 2012) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, (2002)). And "it must be clear that the hostile work environment was the result of discrimination based on a protected status . . . '[o]therwise, the federal courts will become a court of personnel appeals.'" *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) (quoting *Lester v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002))). The court examines "the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance'" in determining whether a workplace is a hostile work environment. *Ahuja v. Detica Inc.*, 742 F. Supp. 2d 96, 104 (D.D.C. 2010) (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris*, 510 U.S. at 23))).

"To establish the prima facie case of her hostile workplace claim, the plaintiff must

demonstrate that '(1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassment, but nonetheless failed to take steps to prevent it.'" *Dorns v. Geithner*, 692 F. Supp. 2d 119, 135-36 (D.D.C. 2010) (quoting *Hendricks v. Paulson*, 520 F. Supp. 2d 65, 89 (D.D.C. 2007)); *see Peters v. District of Columbia*, 873 F. Supp. 2d 158, 187-88 (D.D.C. 2012) ("A plaintiff may establish a violation of Title VII by proving that the employer created or condoned a discriminatorily hostile or abusive environment.") (citing *Vinson*, 477 U.S. at 64-65). The D.C. Circuit cautions that "not all abusive behavior, even when it is motivated by discriminatory animus, is actionable." *Stewart*, 275 F.3d at 1133 (internal quotation marks omitted). Finally, "a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard." *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011).

Plaintiff alleges that she suffered from "a pervasive and continuous pattern of differential treatment" at Howard. Pl.'s Opp'n at 7. Howard responds that Plaintiff has failed to allege facts supporting a hostile work environment claim, but instead has compiled "isolated incidents" that do not amount to objectively hostile conditions. Def.'s Mem. at 14-15.

Taken together, the incidents and actions Plaintiff identifies in her Complaint do not amount to conduct so severe or pervasive as to constitute a plausible hostile work environment. She alleges no "discriminatory intimidation, ridicule, and insult," so severe or so pervasive as to "alter the conditions of employment and create an abusive working environment." *Vinson*, 477 U.S. at 65, 67. Nor does Plaintiff proffer any non-conclusory factual allegations tending to show that Howard took action against her because of her race, gender, religion or national origin. *See*

*Baloch*, 550 F.3d at 1201 (rejecting hostile work environment claim when none of the actions "expressly focused on race, religion, age, or disability" and were "not supported by evidence of tangible workplace consequences").

It is apparent that Plaintiff and Howard had disagreements regarding her conduct and performance during the ten months of her residency, and that Plaintiff was quick to counter negative or unfavorable actions or statements her supervisors made during that time. These incidents reflect "[o]ccasional instances of less favorable treatment involving ordinary daily workplace decisions [which] are not sufficient to establish a hostile work environment." *Bell v. Gonzales*, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) (citations omitted); *see Aldrich v. Burwell*, 197 F. Supp. 3d 124, 138 (D.D.C. 2016) (finding that incidents which "relate to workplace reprimands . . . and punishment flowing from them" do not reflect severe or offensive conduct that might create objectively abusive environment). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment," *Faragher*, 524 U.S. at 788, and Plaintiff's factual allegations do not rise to that level.

### 4. Constructive Discharge

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that [her] 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)). "The inquiry is objective[,]" *Suders*, 542 U.S. at 141, and a plaintiff must show "'something more' than, say, a hostile work environment claim alone." *Robinson v. Ergo Sols., LLC*, 85 F. Supp. 3d 275, 283 (D.D.C. 2015) (quoting *Suders*, 542

U.S. at 147) (additional citation omitted). "[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." *Id.* (quoting *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1015 (7th Cir. 1997)).

Plaintiff has not alleged sufficient facts to make out claims of disparate treatment or a hostile work environment. While she does plead a retaliation claim, she alleges no facts connecting any adverse action to her race, sex, religion or national origin. Notwithstanding Plaintiff's assertions of an intolerable work environment, she fails to allege some aggravating factor which might support an inference that a reasonable employee in Plaintiff's shoes would have left her job while seeking redress.

While it is clear Plaintiff was unhappy with her treatment at Howard, there was a path to her continued employment – successful completion of the performance plan. Instead, Plaintiff chose to resign. The D.C. Circuit has found no constructive discharge where an "employee [left] an unpleasant but objectively tolerable job because alternatives [became] more attractive, even if the employer's misbehavior create[d] the unpleasantness or . . . affirmatively increase[d] the appeal of the employee's alternatives." *Taylor v. FDIC*, 132 F.3d 753, 766 (D.C. Cir. 1997). The court finds that under the facts and circumstances Plaintiff alleges, she has failed to identify an aggravating factor which rendered her continued employment intolerable, and therefore has failed to state a claim for constructive discharge.

## C. Plaintiff's ADA Claim

"To state a claim for failure to accommodate, a plaintiff must allege facts sufficient to show that (1) [she] had a disability within the meaning of the ADA; (2) [her] employer had notice of [her] disability; (3) [she] could perform the essential functions of the position with

reasonable accommodation; and (4) [her] employer refused to make such accommodation."

*Hodges v. District of Columbia*, 959 F. Supp. 2d 148, 153-54 (D.D.C. 2013) (citing *Gordon v. District of Columbia*, 480 F. Supp. 2d 112, 115 (D.D.C. 2007)). For purposes of the ADA, the term "disability" means:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment[.]

42 U.S.C. § 12102(1). "Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

The Complaint alleges that Plaintiff has a disability, later identified as Sjogren's/SLE, a chronic autoimmune condition of which Howard was aware and which substantially limits the major life activities of working, standing, walking, bending and lifting. Compl. ¶¶ 61, 73; *see* Pl.'s Opp'n at 21. Plaintiff claims that Howard failed to accommodate her disability following the September 2016 sharps injury, when she allegedly sought "a change in the work environment . . . in the way things are customarily done," Compl. ¶ 61, as well as "paid sick leave and extra help from [her] peers." Pl.'s Opp'n at 22. Missing from Plaintiff's submissions are critical factual allegations from which the court might infer that Plaintiff could perform the essential functions of her position with reasonable accommodation. Absent such allegations, the court cannot find that Plaintiff is a qualified individual for ADA purposes. *See Badwal v. Bd. of Trustees of Univ. of the District of Columbia*, 139 F. Supp. 3d 295, 310 (D.D.C. 2015)

(dismissing ADA claim of university professor whose "Complaint makes allegations tending to show . . . that [he] was *not* capable of performing the essential functions of his job").

Plaintiff objects to Dr. Filani's decision, "without consulting [her] or offering a more reasonable accommodation," to relieve her of hospital call duties in March 2017 while she was wearing a shoulder sling. Compl. ¶ 63. Howard argues that Plaintiff has failed to plead a disability under the ADA, and that at most, she suffered from "temporary impairments of short duration [which] are not qualifying life events that fall within the ADA." Def.'s Mem. at 18-19. Regardless of whether impairment necessitating a shoulder sling is a disability for ADA purposes or a temporary impairment, the Complaint is deficient. Plaintiff alleges that she was unable to deliver babies, respond to emergencies, or otherwise to perform the duties of a resident, but she does not allege that she would have been able to perform her duties with a reasonable accommodation and to identify the accommodation that she requested and was refused. *See Badwal*, 139 F. Supp. 3d at 310-11.

### III. CONCLUSION

On review of the parties' submissions, the court concludes that Plaintiff fails to state a disparate treatment, hostile work environment, constructive discharge, or ADA claim upon which relief can be granted, but does adequately allege a retaliation claim. Accordingly, it is hereby

ORDERED that Defendants' Motion to Dismiss [11] is GRANTED IN PART and DENIED IN PART; and it is further

ORDERED that Plaintiff's Motion for Leave of the Court to Permit Plaintiff to Provide Further Briefing on Defendant's Motion to Dismiss [17] is DENIED and is construed as Plaintiff's Surreply.

The Clerk of Court shall mail a copy of the Memorandum Opinion and Order to:

DANIELLE SHAPIRO
2727 Central Avenue NE
Washington, DC 20018

DATE:  September 30, 2019

/s/
TANYA S. CHUTKAN
United States District Judge