# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DANIELLE SHAPIRO,            )
                                    )
                Plaintiff,      )     Case No.:  1:18-cv-02588-TSC
      v.                        )
                                      )
HOWARD UNIVERSITY,        )
                                    )
               Defendant.    )
                                    )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND/OR <u>MOTION TO DISMISS FOR FAILURE TO PROSECUTE</u>

*******************

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................................. 2

   a.   Family Medicine Residency Program ........................................................ 2

   b.   The Hiring of Plaintiff ................................................................................. 3

   c.   Plaintiff's General Deteriorating Work Performance ............................. 4

   d.   Plaintiff's Issues at La Clinica .................................................................. 4

   e.   Plaintiff's Alleged Protected Activities ..................................................... 5

   f.   Plaintiff's Formal Warning Letter ........................................................... 5

   g.   Program Director's Meeting ...................................................................... 6

   h.   Plaintiff's Absences .................................................................................... 7

   i.   Plaintiff's Performance Improvement Plan ............................................. 8

   j.   Plaintiff's Voluntary Resignation ............................................................ 9

   k.   Procedural History ..................................................................................... 9

   l.   Plaintiff's Refusal to Participate in Discovery ...................................... 10

III.   STANDARD OF REVIEW ........................................................................... 11

   a.   Standard of Review for a Rule 56 Motion for Summary Judgment ....... 11

   b.   Standard of Review for a Rule 41 Motion to Dismiss for Failure to Prosecute ......... 11

IV.   ARGUMENT ................................................................................................. 12

   a.   Motion for Summary Judgment ............................................................. 12

      i.   *Plaintiff Has Not Established a Prima Facie Case of Retaliation* ............... 13

        1.   Plaintiff Did Not Have a Good Faith Basis for Engaging in a Protected Activity ..... 13

        2.   Plaintiff Has Not Alleged a Materially Adverse Action ............................ 14

        3.   Plaintiff Cannot Demonstrate a Causal Link Between a Material Adversity and Protected Activity ...... 19

      ii.   *No Reasonable Jury Could Infer Retaliation from the Evidence* ............... 20

   b.   Motion to Dismiss for Failure to Prosecute .......................................... 24

V.    CONCLUSION .............................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**

Allen v. United States, 277 F.R.D. 221 (D.D.C. 2011) .................................................. 25

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)................................................. 11

*Baloch v. Kempthorne, 550 F.3d 1191 (D.C. Cir. 2008)................................... 15, 17, 18

Bell v. Donley, 928 F. Supp. 2d 174 (D.D.C. 2013)...................................................... 21

Bomate v. Ford Motor Co., 761 F.2d 713 (D.C. Cir. 1985) ......................................... 12

Bristol Petroleum Corp. v. Harris, 901 F.2d 165 (D.C. Cir. 1990)............................... 24

Burke v. Gould, 286 F.3d 513 (D.C. Cir. 2002) ........................................................... 11

*Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006) ......................... 14, 15

Cavezza v. U.S. Dep't of Justice, No. CV 15-182 (JEB), 2015 WL 4938679
   (D.D.C. Aug. 19, 2015).............................................................................................. 12

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................................ 11

Hairston v. Boardman, 915 F. Supp. 2d 155 (D.D.C. 2013), aff'd sub nom.
   Hairston v. Vance-Cooks, 773 F.3d 266 (D.C. Cir. 2014)......................................... 23

James v. Nationstar Mortg. LLC, 323 F.R.D. 85 (D.D.C. 2017).................................. 25

Jimenez v. McAleenan, No. 17-cv-2731, 2019 WL 3935182 (D.D.C. Aug. 20, 2019) .............. 14

Link v. Wabash R.R. Co., 370 U.S. 626 (1962) ........................................................... 12

Mattson v. Caterpillar, Inc., 359 F.3d 885 (7th Cir. 2004) .......................................... 13

Moore v. Ashcroft, 401 F.Supp.2d 1 (D.D.C. 2005) ..................................................... 18

*Morales v. Gotbaum, 42 F. Supp. 3d 175 (D.D.C. 2014)..................................... 15, 18

*Morris v. McCarthy, 825 F.3d 658 (D.C. Cir. 2016).......................................... 19, 20

Mount v. Johnson, 174 F. Supp. 3d 553 (D.D.C. 2016), aff'd, 664 F. App'x 11
   (D.C. Cir. 2016)........................................................................................................ 20

*Oviedo v. WMATA, 299 F. Supp. 3d 50 (D.D.C. 2018)...................................... 12, 20

Smith–Bey v. Cripe, 852 F.2d 592 (D.C. Cir. 1988) ..................................................... 12

Solomon v. Fairfax Vill. Condo. IV Unit Owner's Ass'n, 621 A.2d 378 (D.C. 1993) ................ 25

Spadola v. New York City Trans. Auth., 242 F. Supp. 2d 284 (S.D.N.Y. 2003)......................... 14

Stella v. Mineta, 231 F.R.D. 44 (D.D.C. 2005) ............................................................ 25

Taylor v. Solis, 571 F.3d 1313 (D.C. Cir. 2009) .......................................................... 15

United States v. Proceeds of Drug Trafficking Transferred to Certain Foreign Bank Accounts, 252 F.R.D. 60 (D.D.C. 2008) ................................................................................ 25

Wiley v. Glassman, 511 F.3d 151 (D.C. Cir. 2007) ....................................................... 15

Williams v. Spencer, 883 F. Supp. 2d 165 (D.D.C. 2012) ........................................... 19

**Statutes**

42 U.S.C. § 2000e-3(a) ..................................................................................... 12, 13

**Rules**

Fed. R. Civ. P. 37(b)(2)..................................................................................... 25

Fed. R. Civ. P. 41(b) ..................................................................................... 11, 24

Fed. R. Civ. P. 56(a) ..................................................................................... 11

Fed. R. Civ. P. 56(e) ..................................................................................... 11

LCvR 83.23................................................................................................. 11

## I.  <u>**INTRODUCTION**</u>

Plaintiff Danielle Shapiro's ("Plaintiff" or "Shapiro") sole remaining claim brought against Defendant Howard University ("Defendant", "Howard" or the "University") for retaliation under Title VII of the Civil Rights Act requires summary judgment as there is no dispute of material fact precluding judgment. The undisputed facts demonstrate that Plaintiff habitually engaged in actions that jeopardized patient care. This included refusing to treat patients, bullying residents, missing required meetings, confronting a physician, excessive absenteeism, and being openly insubordinate to her supervisor. As such, she was issued a warning letter and placed on a performance improvement plan – but voluntarily resigned as opposed to remediating her performance deficiencies.

Given the undisputed facts, summary judgment is therefore necessary. Of note, Plaintiff cannot establish a *prima facie* case of retaliation as: (1) she did not engage in a protected activity under Title VII considering that she admitted that any complaint of discrimination made by her was done offensively to insulate herself from negative action; (2) she has not alleged a material adversity but rather relies on a host of nothing more than trivial harms; and (3) there is no causal relationship between any alleged protected activity and adverse action considering her supervisors were unaware of the alleged protected activity.

*Even if* a *prima facie* case of retaliation is established, Plaintiff cannot meet her ultimate burden that a reasonable jury could find an inference of retaliation. Specifically, on one hand Howard relies on the objective, written evidence reported to Plaintiff's supervisors from numerous sources. On the other hand, Plaintiff relies on her own self-serving speculation that her supervisors, the residents, physicians, and doctors employed by an outside clinic colluded and conspired against

her. No reasonable jury could find an inference of retaliation given the objective evidence relied on by Howard versus Plaintiff's unsupported speculation.

Finally, if the Court determines that summary judgment is inappropriate at the current juncture, dismissal of this suit is necessary due to Plaintiff's failure to prosecute her claim under Rule 41. Plaintiff has failed to participate in discovery despite numerous good faith efforts from Howard and Howard should not be prejudiced by continuing to defend itself in an action that Plaintiff has no desire to prosecute.

## II.   FACTUAL BACKGROUND[1]

### a.   Family Medicine Residency Program

Howard offers postgraduate training to medical residents, the standards for which the Accreditation Council for Graduate Medical Education ("ACGME") establishes. (SOMF ¶ 1). One such residency program is Howard's Family Medicine Residency Program. At all relevant times to the instant action, Dr. Oladunni Filani was the Interim Program Director and Dr. Mark Johnson was the Chair of the Family Medicine Program. (SOMF ¶¶ 3, 5). Dr. Filani's responsibilities as Interim Program Director included ensuring that the program is compliant with all ACGME requirements pertaining to medical residents. (SOMF ¶ 4).

At any given time, the Family Medicine Program has approximately 18 medical residents that are equally apportioned between first year residents ("PGY1", also known as "interns"), second year residents ("PGY2"), and third year medical residents ("PGY3"). (SOMF ¶ 6).

---

[1]   For purposes of this Motion, the University relies, in part, on documents that Plaintiff previously filed with this Court as well as the Court's September 30, 2019 Order. (Dkt. # 19). Howard reserves the right to supplement or amend the instant Motion should Plaintiff participate in discovery or if any additional information becomes available.

Importantly, senior residents have no formal supervisory or evaluative role over junior residents. (SOMF ¶ 7).

The Family Medicine Residency Program must adhere to accreditation guidelines. According to the ACGME guidelines, a resident in Howard's Family Medicine Residency must achieve competency in professionalism and interpersonal and communication skills. (SOMF ¶ 6). The American Board of Family Medicine ("ABFM") also mandates attendance requirements for residents such that absences (regardless of reason) must not exceed a combined total of one (1) month per academic year. Absence from residency education, in excess of one month within the academic year must be made up before the resident advances to the next training level. (SOMF ¶ 9).

The Family Medicine Program is also bound by the University's general policies. Specifically, Howard's Employee Handbook contemplates progressive discipline when an employee's conduct does not meet acceptable standards. (SOMF ¶ 11). The progressive discipline noted in the Employee Handbook suggests informal counseling followed by formal disciplinary action (Letter of Admonition; Letter of Warning and Performance Improvement Plan (PIP); a Final Warning; and Termination), and the University reserves the right to omit any level of the progressive discipline process. (SOMF ¶¶ 12, 13).

### b.  **The Hiring of Plaintiff**

Due to attrition, the Family Medicine Residency Program had two PGY2 openings for academic year 2016-2017. (SOMF ¶ 14). Plaintiff applied for and was hired by Howard to be a PGY2 resident beginning on or about July 1, 2016. (SOMF ¶ 15). Dr. Filani was a member of the panel that interviewed Plaintiff and he (Dr. Filani) was Plaintiff's direct supervisor at all relevant times that she (Plaintiff) was employed by Howard. (SOMF ¶¶ 16-17). After she began

3

employment, Plaintiff was notified by memorandum dated January 27, 2017 that the University intended to renew her employment for the 2017-2018 academic year if she successfully completed the PGY2 year. (SOMF ¶ 18).

### c. Plaintiff's General Deteriorating Work Performance

While Plaintiff's work performance was satisfactory immediately after her hire, her work performance began to deteriorate during the Fall of 2016 as determined by her supervisors. (SOMF ¶ 22). Specific examples of Plaintiff's deteriorating work performance are listed below:

- Plaintiff missed a required meeting on November 9, 2016 and Dr. Filani did not view her (Plaintiff's) excuse for missing the meeting as valid. (SOMF ¶¶ 23, 24).

- On December 7, 2016, Dr. Filani was contacted by another physician (Dr. Omole) who indicated that Plaintiff was not present for a patient evaluation and that she (Plaintiff) separately refused to care for an assigned patient. (SOMF ¶ 25).

- On February 6, 2017, a group of her fellow residents emailed Dr. Filani and noted that Dr. Shapiro was a "common concern". (SOMF ¶ 27).

- Dr. Filani viewed that Plaintiff was openly insubordinate to his supervision when she contacted a vendor without his permission and, contrary to his instruction, advised other residents that they did not have to retake an online assignment. (SOMF ¶¶ 28-32).

- Dr. Filani determined that Plaintiff was unprofessional and engaged in an act of bullying when on March 30, 2017 she emailed the interns and alleged their work performance was "concerning" and "disheartening". (SOMF ¶¶ 33-34).

### d. Plaintiff's Issues at La Clinica

During late 2016/early 2017, Plaintiff was assigned a rotation at a maternal care clinic – La Clinica. (SOMF ¶ 35). Her supervising physician at La Clinica was Dr. Joshua Kolko. (Id.). On February 23, 2017, Dr. Kolko emailed Dr. Filani regarding an interaction he (Dr. Kolko) had with Plaintiff on February 1, 2017. (SOMF ¶ 36). Dr. Kolko alleged that Plaintiff affirmatively stated that "she would not be involved in deliveries" and that Plaintiff had multiple absences from her rotation at La Clinica that were not approved by Dr. Filani. (SOMF ¶¶ 37-40). Dr. Filani was

4

surprised by this email as he did not approve Plaintiff's absences. (SOMF ¶ 40). In fact, Plaintiff

admits that she refused deliveries, patients, and instruction at La Clinica. (SOMF ¶¶ 41-45).[2]

At some point after February 23, 2017, Dr. Kolko called Dr. Filani and alleged that Plaintiff

appeared at La Clinica with her mother to confront Dr. Kolko. (SOMF ¶ 46). This allegation was

concerning to Dr. Filani as it was reported to him that Plaintiff confronted a supervising physician

<u>and</u> it was unprofessional for Plaintiff to have a family member come to her place of work. (SOMF

¶ 46).

### e.   <u>Plaintiff's Alleged Protected Activities</u>

In her Complaint, Plaintiff alleges she engaged in a protected activity on March 9, 2017 by

meeting with a member of Howard's Office of Human Resources. (SOMF ¶ 47).[3] During this

meeting, Plaintiff alleges that she raised issues of "mistreatment, differential treatment and

retaliation." (SOMF ¶ 47). However, Plaintiff's supervisors were unaware that this meeting

occurred; or that Plaintiff generally made a complaint of discrimination. (SOMF ¶ 48). In fact,

Plaintiff admits that she affirmatively engaged in a protected activity to insulate herself from

termination and/or negative work assessment. (SOMF ¶ 50).

### f.   <u>Plaintiff's Formal Warning Letter</u>

Due to concerns about Plaintiff's general deteriorating work performance, Dr. Johnson and

Dr. Filani jointly sent her a formal warning email on March 9, 2017. (SOMF ¶¶ 51-52). The formal

warning email was intended to provide Plaintiff a warning so that she could remediate any work

---

[2]      Given Plaintiff's abject failure to participate in discovery, Howard relies (in part) on the admissions and concessions Plaintiff made by not responding to Howard's Requests for Admissions. (SOMF ¶¶ 122-132).

[3]      For purposes of this Motion only, Howard will assume that the protected activity occurred as alleged in the Complaint. However, Howard reserves its right to amend its position in this regard given that Plaintiff has failed to engage in the discovery process.

deficiencies. (SOMF ¶ 53). At the time of sending the formal warning email, neither Dr. Johnson nor Dr. Filani were aware that Plaintiff had engaged in a protected activity. [4] The formal warning email was based upon Plaintiff's "refusals to complete … work assignments, insubordination, and failure to adhere to program requirements concerning work assignments for interns." (SOMF ¶ 55). The formal warning email cites to: the issues reported to Howard by La Clinica; Plaintiff's general refusal to treat patients; and a failure to provide oversight to the interns. The warning email states that Plaintiff's actions "pose[] a potential risk to patient safety." (Dkt.# 14-1 at p. 92).

Plaintiff admits she had no damages as a result of the formal warning email and that the formal warning email did not have a materially adverse impact on her employment. (SOMF ¶¶ 56-57). In fact, Plaintiff admits that it is her viewpoint that being issued a formal warning email would not have dissuaded a reasonable employee from engaging in a protected activity. (SOMF ¶ 58).

### g. **Program Director's Meeting**

According to the Program's guidelines, each resident is expected to have an evaluation meeting with the Program directors on a biannual basis. (SOMF ¶ 60). On January 6, 2017, Dr. Filani emailed all residents to prospectively schedule their mid-year evaluations. (SOMF ¶ 61). According to Dr. Filani, it is difficult to schedule the evaluations of the numerous residents as it requires coordinating the calendars of multiple practicing clinicians and the evaluations are therefore scheduled over a staggered period of time. (SOMF ¶ 62). Dr. Filani was made aware that Plaintiff sought to reschedule her evaluation, originally scheduled for mid-February 2017, until after she completed her in-patient rotation. (SOMF ¶ 63). As such, any rescheduling of Plaintiff's evaluation was at her request.

---

[4]     It is unclear if Plaintiff engaged in the alleged protected activity with Howard's Office of Human Resources *after* she was sent the formal warning email as both events occurred on March 9, 2017.

After Plaintiff sought to reschedule her evaluation meeting, Dr. Johnson, the Chair of the Department, contacted Plaintiff to remind her that she was required to participate in her mid-year evaluation. (SOMF ¶ 67). Importantly, as Chair of the Department, it is within his purview to contact subordinate employees, including residents, regarding administrative tasks. (SOMF ¶ 68). Nonetheless, Dr. Johnson did not participate in the evaluation meeting when it occurred. (SOMF ¶ 67).

Generally, during the mid-year evaluations, Dr. Filani reads to all residents from an evaluative form of their work performance created by the Clinical Competency Committee ("CCC"). (SOMF ¶ 72). In creating the evaluative form, the CCC aggregates its feedback in several categories and provides the form to Dr. Filani to share with the resident. (SOMF ¶ 73). Put another way, the purpose (in-part) of the mid-year evaluation for all residents is for Dr. Filani to read from the CCC's evaluative form.

Ultimately, Plaintiff's mid-year evaluation occurred in April of 2017. At that meeting, as per his standard practice, Dr. Filani read the CCC's evaluative form to Plaintiff. However, Plaintiff refused to participate in the mid-year evaluation unless her family members, who are not Howard employees, were present. (SOMF ¶ 78). Dr. Filani determined that demanding her family members be present at the mid-year evaluation was unprofessional conduct for a physician. (SOMF ¶ 79).

**h.  Plaintiff's Absences**

Due to concerns about Plaintiff's prospectively scheduled absences exceeding the ABFM guidelines, Dr. Filani sent Plaintiff good faith correspondences in April of 2017 inventorying her absences. (SOMF ¶ 79). Specifically, on April 12 and 13, 2017, Dr. Filani sent Plaintiff letters outlining her scheduled absences and reminding her that any absences that exceeded the guidelines would delay her progression to the next year of training. (SOMF ¶¶ 81-84). However, the same

correspondence stated that Plaintiff would be afforded the opportunity to remediate any absences that would exceed the guidelines. (SOMF ¶ 84).

### i.   Plaintiff's Performance Improvement Plan

Due to the myriad concerns regarding Plaintiff's deteriorating work performance, Plaintiff's conduct was referred to the CCC in the Spring of 2017. (SOMF ¶ 87). It was Dr. Filani's opinion that Plaintiff's work conduct over a short period of time posed a risk to patient care and jeopardized the same. (SOMF ¶ 113). At the time of the referral, Dr. Filani was not aware that Plaintiff had made a complaint of discrimination to Howard's Office of Human Resources. (SOMF ¶ 88).

On April 26, 2017, the CCC determined by unanimous vote that Plaintiff required a performance improvement plan ("PIP"). (SOMF ¶ 89). In requiring the PIP, the CCC determined that Plaintiff demonstrated "serious deficiencies" in her professionalism and interpersonal and communication skills. (SOMF ¶ 90). As basis for the PIP the CCC made the following determinations:

- Plaintiff had an "[inability] to demonstrate professional conduct and accountability." Specifically, she repeatedly refused to complete her training requirements, oversee interns, and demonstrate insight into her own behavior. (SOMF ¶ 91).

- Plaintiff demonstrated "[poor] decision making in the management of patients in the clinical setting" by refusing patients at La Clinica and cancelling numerous clinical sessions without regard to patient care. (SOMF ¶ 91).

- Plaintiff had an "[inability] to professionally, respectfully, and effectively communicate with team members." In support, the CCC stated that Plaintiff had communicated with the intern class in a bullying and intimidating manner. (SOMF ¶ 91).

- Plaintiff demonstrated an inability "to develop relationships and effectively communicate with physicians, healthcare professionals, and healthcare teams, as demonstrated by [her] bullying and harassing communications" with the interns and a supervising physician at La Clinica. (SOMF ¶ 91).

8

- Plaintiff demonstrated a failure to understand the importance of the health care team and respect for skills and contributions of others, as demonstrated by her bullying and harassing communications with the interns. (SOMF ¶ 91).

- Plaintiff demonstrated an inability to communicate collaboratively with the health care team by listening attentively, sharing information, and giving and receiving constructive feedback. (SOMF ¶ 91).

For these reasons, Plaintiff was placed on the PIP. (SOMF ¶ 108).[5] At the conclusion of the PIP, the CCC would reevaluate her performance to determine if she had remediated her work performance and could continue her employment. (SOMF ¶ 109).

### j.   **Plaintiff's Voluntary Resignation**

Prior to completion of her PIP, Plaintiff voluntarily resigned from her position at Howard on May 2, 2017. (SOMF ¶¶ 114-115). This Court has already adjudicated that Plaintiff's resignation was voluntary and that she was not constructively discharged. (SOMF ¶¶ 116-117).

### k.   **Procedural History**

Plaintiff filed the instant action on November 8, 2019 and the Court has interpreted Plaintiff's Complaint as bringing claims for: (1) discriminatory disparate treatment under Title VII; (2) a discriminatory hostile work environment under Title VII; (3) constructive discharge; (4) retaliation under Title VII; and (5) violations of the Americans with Disabilities Act. (SOMF ¶¶ 118-119). On September 30, 2019, Howard's Motion to Dismiss was granted in part by this Court such that the only surviving claim was Plaintiff's claim for retaliation under Title VII. (SOMF ¶ 120). In allowing the retaliation claim to survive, the Court noted that Plaintiff has alleged five potential adverse employment actions: (1) cancelling the Program Director's Meeting originally

---

[5]      Plaintiff admits that she agrees with the basis for the PIP, has no damages as a result of the PIP, the PIP did not have a materially adverse impact on her employment, and that it is her viewpoint that being placed on a PIP would not dissuade a reasonable employee from engaging in a protected activity. (SOMF ¶¶ 97-107, 110-112).

scheduled for February 14, 2017; (2) having Dr. Johnson, not Dr. Filani, convene the Program Director's Meeting; (3) having Dr. Filani read from a template at the Program Director's Meeting; (4) putting Plaintiff on probation; and (5) issuing Plaintiff a Formal Warning. (SOMF ¶ 121).

**l.   Plaintiff's Refusal to Participate in Discovery**

On May 4, 2020, consistent with the Scheduling Order entered by the Court, Defendant propounded written discovery to the Plaintiff consisting of Interrogatories, Requests for Production of Documents and Requests for Admission of Fact. (SOMF ¶ 121). On May 7, 2020 counsel for Howard sent Plaintiff an email that a courtesy copy of the discovery could be provided via e-mail upon request. (SOMF ¶ 123).

Having not received Plaintiff's answers to the discovery requests, counsel for Howard sent Plaintiff good faith requests for her answers on August 6, 2020, August 28, 2020 and September 14, 2020. (SOMF ¶¶ 121, 128, 129). In fact, counsel for Howard provided Plaintiff a courtesy copy of the discovery electronically on August 6, 2020 and consistently noticed Plaintiff that Howard intended to move to dismiss her lawsuit for a failure to prosecute under Rule 41 should she not respond to Howard's discovery requests. (SOMF ¶¶ 121, 128, 129).

In response to Howard's good faith requests for Plaintiff's answers to its discovery requests, Plaintiff affirmatively stated that she did not intend to participate in discovery. (SOMF ¶ 130). Rather, Plaintiff stated that Howard's good faith efforts to obtain her discovery responses in the lawsuit she filed are "cruel and shameful[.]" (SOMF ¶ 131).

To date, Plaintiff has not responded to Howard's discovery requests that were propounded more than 200 days ago, and discovery is set to close on January 7, 2021. (SOMF ¶¶ 132-133).

### III.    STANDARD OF REVIEW

#### a.    Standard of Review for a Rule 56 Motion for Summary Judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of a factual dispute is not sufficient to preclude summary judgment unless the dispute pertains to "material" facts. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Moreover, any dispute must be "genuine," *i.e.*, supported by admissible evidence, not solely allegations or by relying on "the mere pleadings themselves." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Fed. R. Civ. P. 56(e) (providing types of evidence a court will consider on a motion for summary judgment). Moreover, "if the evidence presented by the opposing party is 'merely colorable' or 'not significantly probative,' summary judgment may be granted." Burke v. Gould, 286 F.3d 513, 519 (D.C. Cir. 2002) (internal quotations omitted). When the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by showing "an absence of evidence" to support the nonmoving party's case. See Celotex, 477 U.S. at 325.

#### b.    Standard of Review for a Rule 41 Motion to Dismiss for Failure to Prosecute

Under Federal Rule of Civil Procedure 41(b), "[i]f the plaintiff fails to prosecute or to comply with [the Federal Rules] or a court order, a defendant may move to dismiss the action or any claim against it." Fed. R. Civ. P. 41(b); see also LCvR 83.23 ("A dismissal for failure to prosecute may be ordered by the Court upon motion by an adverse party, or upon the Court's own motion."). A court's authority to dismiss suits has long been recognized as "necessary in order to

11

prevent undue delays in the disposition of pending cases and to avoid congestion" in the courts. Link v. Wabash R.R. Co., 370 U.S. 626, 629-30 (1962).

"A Rule 41(b) dismissal is proper if, in view of the entire procedural history of the case, the litigant has not manifested reasonable diligence in pursuing the cause." Bomate v. Ford Motor Co., 761 F.2d 713, 714 (D.C. Cir. 1985). Consequently, "[a] lengthy period of inactivity may ... be enough to justify dismissal under Rule 41(b)." Smith–Bey v. Cripe, 852 F.2d 592, 594 (D.C. Cir. 1988); see also Cavezza v. U.S. Dep't of Justice, No. CV 15-182 (JEB), 2015 WL 4938679, at *1 (D.D.C. Aug. 19, 2015) (same).

## IV.    ARGUMENT

### a.    Motion for Summary Judgment

Title VII forbids retaliation against an employee because the employee "opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). "[R]etaliation claims based on circumstantial evidence ... trigger the familiar burden-shifting framework of McDonnell Douglas." Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009).

"[A] plaintiff must first establish a prima facie case of retaliation by showing (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." Id. The burden then "shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions." Id. "If the employer does so, the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence." Id. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff remains at all times with the plaintiff." Oviedo v. WMATA, 299 F. Supp. 3d 50, 61 (D.D.C. 2018)(internal citations omitted).

12

Here, summary judgment is necessary as it is undisputed that Plaintiff has failed to establish a *prima facie* case of retaliation. Even if a *prima facie* case of retaliation exists, summary judgment is necessary as she cannot demonstrate that any of the alleged protected activities were pretextual and no reasonable jury could infer retaliation from the evidence.

### i. **Plaintiff Has Not Established a Prima Facie Case of Retaliation**

#### 1. **Plaintiff Did Not Have a Good Faith Basis for Engaging in a Protected Activity**

The first element of a retaliation claim under Title VII requires that Plaintiff engaged in a protected activity – that is, that she opposed or challenged any practice made unlawful under Title VII, or filed a charge under Title VII. 42 U.S.C. § 2000e–3(a). However, merely mouthing words of a complaint to a supervisor without a good faith basis is not a protected activity. Rather, a malicious complaint of discrimination made to avoid adverse action is not entitled to protection under Title VII.

Specifically, in <u>Mattson</u> the Seventh Circuit held that "baseless claims [of a protected activity] do not receive protection under Title VII." <u>Mattson v. Caterpillar, Inc.</u>, 359 F.3d 885, 890 (7th Cir. 2004) (citations omitted). In so holding, the court stated: "an employee could immunize his unreasonable and malicious internal complaints simply by filing a discrimination complaint … Similarly, an employee could assure himself unlimited tenure by filing continuous complaints … if he fears that his employer will discover his … behavior at the workplace." <u>Id</u>. at 891. Similarly, the <u>Spadola</u> court held:

> [Title VII] is designed to protect the right of employees in good faith to protest discrimination they reasonably perceive they suffered, and to encourage reporting of serious offenses free from fear of reprisals … [The] purpose of Title VII retaliation claims [is not] to arm employees with a tactical coercive weapon that may be turned against the [employer] … to escape … disciplinary measures.

13

Spadola v. New York City Trans. Auth., 242 F. Supp. 2d 284, 292 (S.D.N.Y. 2003).

Here, Plaintiff admits her basis for engaging in a protected activity was brought in bad faith and therefore not entitled to protection under Title VII. Specifically, Plaintiff admits that she affirmatively contacted Howard's Office of Human Resources regarding Dr. Johnson in order to insulate herself from termination and negative work assessment. (SOMF ¶ 50).

The temporal concerns of Plaintiff's alleged protected activity further bolster the bad faith and malicious nature of that complaint. Specifically, Plaintiff brought her complaint only after numerous complaints were made about her by La Clinica (SOMF ¶¶ 35-46), the residents (SOMF ¶ 27), and her supervisor (SOMF ¶¶ 24, 28-32). At core, Plaintiff has admitted that she brought her alleged protected activity to avoid discipline; such conduct is not protected under Title VII.

## 2. Plaintiff Has Not Alleged a Materially Adverse Action

"What constitutes an adverse action in the discrimination context is different than what constitutes an adverse action in the retaliation context." Jimenez v. McAleenan, No. 17-cv-2731, 2019 WL 3935182, at *9 (D.D.C. Aug. 20, 2019) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). "A retaliatory adverse action ... encompasses a broader sweep of actions than those in a pure discrimination claim and may extend to harms that are not workplace-related or employment-related so long as a reasonable employee would have found the challenged action materially adverse." Id. (brackets, internal quotation marks and citations omitted). The test is whether "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N., 548 U.S. at 68 (internal quotation marks and citations omitted). But an actionable retaliation claim is one "where an employer causes

14

'*material* adversity,' not 'trivial harms.'" <u>Wiley v. Glassman</u>, 511 F.3d 151, 161 (D.C. Cir. 2007) (per curiam) (<u>quoting</u> <u>Burlington N</u>., 548 U.S. at 68) (emphasis in original).

Indeed, alleging a material adversity is no small task. For instance, in <u>Morales</u> the court held that an "infrequent imposition of demanding goals and increased oversight is unlikely to prevent a reasonable employee from engaging in protected activity and therefore does not amount to a materially adverse action." <u>Morales v. Gotbaum</u>, 42 F. Supp. 3d 175, 199 (D.D.C. 2014). Similarly, an employee being required to "submit biweekly reports on the status of her work" amounted to nothing more than a "minor 'inconvenience[ ] and alteration of job responsibilities'" and therefore did "'not rise to the level of adverse action' necessary to support a [retaliation] claim." <u>Taylor v. Solis</u>, 571 F.3d 1313, 1321 (D.C. Cir. 2009)(citations omitted). To wit, a materially adverse action does <u>not</u> include: an unserved suspension; a letter of counseling; a letter of reprimand; or an unsatisfactory performance review. <u>Baloch v. Kempthorne</u>, 550 F.3d 1191, 1199 (D.C. Cir. 2008)("The letters [regarding work performance], however, contained no abusive language, but rather job-related constructive criticism, which can prompt an employee to improve her performance.")(internal citations and quotations omitted).

Here, the Court has identified five potential adverse actions alleged by Plaintiff;[6] however, as analyzed more thoroughly below, none of those activities are actionable adverse actions to

---

[6]    Plaintiff admits that she does not have any damages as a result of any of the alleged adverse actions. (SOMF ¶¶ 56, 64, 69, 75, 110). She also admits that in her viewpoint, none of the alleged adverse actions would dissuade a reasonable employee from engaging in a protected activity; nor did the alleged adverse actions have a materially adverse impact on her employment. (SOMF ¶¶ 57-58, 65-66, 70-71, 76-77, 111-112). Thus, any retaliation claim brought based upon the alleged adverse actions are futile and there is no remedy for the Court to provide Plaintiff given that she admits to suffering no damages or adverse action.

support a Title VII retaliation claim.[7]

**Rescheduling the February 14, 2017 Program Director's Meeting**. As a threshold matter, the Court has adjudicated that any alleged protected activity by Plaintiff occurred on March 9, 2017. As such, the rescheduling of Plaintiff's evaluative meeting on February 14, 2017 was <u>before</u> Plaintiff allegedly engaged in a protected activity. Obviously, Howard could not retaliate against Plaintiff on February 14, 2017 for an alleged protected activity that occurred some three weeks <u>after</u> that date.

Setting the temporal issues aside, Howard rescheduling Plaintiff's evaluative meeting falls woefully short of being a materially adverse action. Of note, it is undisputed that the meeting was rescheduled at her request and therefore was not an adverse action – rather it was Howard accommodating her request.[8] (SOMF ¶ 63). Anyhow, rescheduling a meeting for several weeks later is nothing more than a trivial harm, especially considering the difficulty of scheduling a meeting that requires the coordination of multiple practicing clinicians. (SOMF ¶ 62). Finally, if the substance of the evaluative meeting cannot be considered a material adversity then rescheduling the meeting itself can be nothing more than a trivial adversity.

**Dr. Johnson Convening the Program Director's Meeting**. Dr. Johnson, the Chair of the Department, contacting Plaintiff to schedule her evaluative meeting is nothing more than a trivial harm alleged by Plaintiff. As the Chair, Dr. Johnson oversees all employees in his Department,

---

[7]    As a matter of efficiency, with its inventory of the alleged adversities, Howard provides the legitimate and non-retaliatory reasons for each alleged adversity. As such, Howard contends it has satisfied its burden under the <u>McDonnell Douglas</u> burden shifting framework.

[8]    Howard's legitimate and non-discriminatory reason for rescheduling the meeting is that Plaintiff requested the meeting date be changed.

including residents, and it is within his purview to contact employees under his supervision.[9] (SOMF ¶ 68). In any event, Dr. Johnson did not attend the evaluative meeting so having Dr. Johnson discharge his duties as a supervisor by sending a single email to Plaintiff to ensure she attended a required meeting is nothing more than a trivial adversity. Baloch, 550 F.3d at 1199. *Even if* Plaintiff did engage in a protected activity, she cannot permanently avoid having her supervisor contact her regarding administrative matters. Finally, if the substance of the evaluative meeting itself could not be considered a materially adversity, then it is axiomatic that Dr. Johnson contacting Plaintiff on one occasion about the meeting could not be considered a materially adverse action.

**Dr. Filani Reading from a Template at the Program Director's Meeting**. Plaintiff has not and cannot put forward any evidence that Dr. Filani reading from a template during the evaluative meeting was a materially adverse action. Specifically, it is Dr. Filani's practice to read to all residents during their evaluative meeting from a precomposed evaluation form drafted by the CCC. (SOMF ¶¶ 72-74). Put another way, by reading from the CCC's evaluative form, Dr. Filani treated Plaintiff in the same manner as he would all other residents.[10] There is no adversity, and certainly no material adversity, to Plaintiff associated with this alleged adverse action whereby she was treated the same as her colleagues. In any event, a supervisor's assessment of an employee's work performance absent any abusive language is not a material adversity. Baloch, 550 F.3d at 1199.

---

[9]     Howard's legitimate and non-discriminatory reason for Dr. Johnson contacting Plaintiff is that it was within his purview as Chair to contact subordinate employees to ensure they attended required meetings.

[10]     Howard's legitimate and non-discriminatory reason for Dr. Filani reading from a template at the evaluative meeting is that he read from a pre-composed CCC evaluation form – which is his normal practice for the evaluative meetings for all residents.

**Placing Plaintiff on Probation**. The CCC's determination to place Plaintiff on a PIP cannot be considered a materially adverse action for several reasons. *First*, Plaintiff voluntary resigned prior to engaging in the PIP or serving her probation. Baloch, 550 F.3d at 1199 (noting that an unserved suspension is not a materially adverse action.). *Second*, by all accounts, the CCC's determination was based (in part) on multiple documented occurrences that were brought to Dr. Filani by La Clinica, the residents and other physicians.[11] As stated above, an honest assessment of an employee's work performance cannot be considered a materially adverse action when that assessment does not contain any abusive language. *Finally*, this District has held that increased oversight over an employee is not a materially adverse action. Morales, 42 F. Supp. 3d at 199.  For these reasons, Plaintiff fails to articulate an actionable material adverse action.

**Issuing Plaintiff a Formal Warning**.[12] Finally, Dr. Johnson issuing Plaintiff a formal warning email on March 9, 2017 cannot be viewed as a materially adverse action.[13] Specifically, a letter of reprimand is not a materially adverse action for purposes of a retaliation claim. Baloch, 550 F.3d at 1199; see also Moore v. Ashcroft, 401 F.Supp.2d 1, 26 (D.D.C. 2005) ("[M]erely being yelled at by your supervisor does not rise to the level of an adverse employment action."). The

---

[11]    Howard's legitimate and non-discriminatory reasons for placing Plaintiff on the PIP are outlined in the PIP document itself. (SOMF ¶ 91). At core, the PIP was justified given the numerous concerns raised about Plaintiff's work performance, which includes (but is not limited to) complaints made about Plaintiff by residents, other physicians, and La Clinica.

[12]    Howard's legitimate and non-discriminatory reasons for issuing the formal warning letter are located within the letter itself. Specifically, the formal warning email was based upon Plaintiff's "refusals to complete … work assignments, insubordination, and failure to adhere to program requirements concerning work assignments for interns." (SOMF ¶ 55).

[13]    Importantly, Plaintiff alleges that she engaged in a protected activity on the same date of March 9, 2017. It is unclear if this protected activity occurred before or after Dr. Johnson sent the formal warning email. Obviously, there could not be an actionable adverse action if Plaintiff engaged in the protected activity after Dr. Johnson's formal warning email.

lack of sanctions or change in Plaintiff's employment status further attenuates that the warning email was a materially adverse action. All told, the formal warning email was just that – a *warning* – based upon objective concerns that were raised about Plaintiff's work performance by numerous parties and detached from the imposition of any sanctions.

### 3. Plaintiff Cannot Demonstrate a Causal Link Between a Material Adversity and Protected Activity

Assuming *arguendo* that Plaintiff engaged in a protected activity and suffered a material adversity, she cannot establish a causal link between those two events. Specifically, to establish a causal link Plaintiff needs to demonstrate her supervisors who subjected her to a material adversity were aware of her protected activities – a task which she cannot do. Generally making a complaint to an office or organ of an employer does not impute knowledge of a protected activity to a supervisor.

In Morris, the court held that an internal complaint of discrimination made to an EEO office does not inherently impute knowledge of a protected activity to a supervisor. Morris v. McCarthy, 825 F.3d 658, 673-74 (D.C. Cir. 2016). Rather, the court granted summary judgment in favor of the employer in Morris as the plaintiff merely speculated that her supervisors were aware of an alleged protected activity based on circumstantial evidence. Id. Similarly, in Williams, the court held that there was no causal link between a protected activity and material adversity when a supervisor was not made aware of a protected activity brought by a plaintiff to an employer's human resources department. Williams v. Spencer, 883 F. Supp. 2d 165, 178-179 (D.D.C. 2012). Specifically, in determining there was no causal link, the court stated: "[nor] does [plaintiff] suggest that her supervisor was informed of the [protected activities] that she supposedly made in her discussion with the ADR facilitator and [Office of Human Resources] …. The lack of evidence

that her supervisor even knew about the protected activity further weakens any reasonable inference of a retaliatory motive." Id.

Here, it is undisputed that Dr. Filani and Dr. Johnson were not made aware of Plaintiff's alleged protected activities brought at Howard's Office of Human Resources. (SOMF ¶ 91). Under the law, knowledge of her alleged protected activities cannot be imputed to her supervisors, and she has provided no direct or circumstantial evidence that her supervisors were aware of any protected activity. As such, there is no causal link between any protected activity and alleged adversity and Plaintiff cannot establish a *prima facie* case of retaliation.

### ii.  No Reasonable Jury Could Infer Retaliation from the Evidence

Setting aside that Plaintiff has not participated in discovery and therefore failed to adduce any evidence whatsoever, based on the existing record evidence, summary judgment is necessary as no reasonable jury could infer that Howard's alleged actions were retaliatory.

Importantly, the ultimate burden at all times remains with the Plaintiff to demonstrate that any alleged adverse action was retaliatory. Oviedo, 299 F. Supp. 3d at 61-62. Indeed, it is a high bar for the Plaintiff to demonstrate that a reasonable jury could find there is an inference of retaliation. In Oviedo, this Court held that "after adequate time for discovery", a plaintiff did not demonstrate the requisite inference of retaliation by only proffering "a mere unsubstantiated allegation" when faced with a motion for summary judgement. Id; see also Morris, 825 F.3d at 674 ("[A]n employee cannot survive summary judgment if a jury can do no more than 'speculate' that her employer knew of her protected activity."). In a similar vein, a plaintiff's subjective and self-serving beliefs do not create an inference of retaliation necessary to survive summary judgment. Mount v. Johnson, 174 F. Supp. 3d 553, 563 (D.D.C. 2016), aff'd, 664 F. App'x 11 (D.C. Cir. 2016)(Plaintiff "must, at the very least, point to record evidence that is sufficient for a

reasonable jury to disbelieve the veracity of [the proffered non-retaliatory] reason.")(internal citations omitted); <u>Bell v. Donley</u>, 928 F. Supp. 2d 174, 192 (D.D.C. 2013) ("This sort of self-serving assertion hardly rises to the level of a decisive showing.")(internal citations and quotations omitted).

Here, Plaintiff can point to no record evidence to demonstrate that any action taken by Howard was retaliatory. Rather, the abundant record evidence demonstrates that all actions taken by Howard were based on legitimate factual bases and thus no reasonable jury could find there was an inference of retaliation.

*First*, the rescheduling of Plaintiff's evaluative meeting on February 14, 2017 occurred weeks before Plaintiff engaged in any alleged protected activity and therefore inherently was not retaliatory. In any event, the factual basis for the rescheduling of the meeting was that Plaintiff sought to reschedule the meeting. (SOMF ¶ 63). Obviously, Howard could not retaliate against Plaintiff by accommodating her request, and no reasonable jury could find an inference of retaliation in this regard.

*Second*, Dr. Johnson making a single communication to Plaintiff to schedule her evaluative meeting is not retaliatory as it is within his purview as Chair to communicate with his subordinate employees. (SOMF ¶ 68). Merely because Plaintiff may have made a complaint about her supervisor does not permanently shield her forever from communications from her supervisor. It would deal a crushing blow to employers if a single email sent from a supervisor requiring an employee to attend a meeting could be viewed as retaliatory. This is especially so, considering the supervisor did not participate in the meeting itself and no sanctions or adverse action were taken against Plaintiff at the meeting.

*Third*, it was not retaliatory for Dr. Filani to read from a template at her evaluative meeting. Specifically, it is Dr. Filani's practice to read from a CCC evaluation to all residents during their evaluative meetings. (SOMF ¶ 74). It is undisputed that Plaintiff was treated identically to her colleagues in this regard and Plaintiff's subjective disagreement with the mode in which Dr. Filani delivered her evaluation cannot be viewed as possessing an inference of retaliation. Plaintiff also does not allege that the substance of the evaluation was in any way negative.

*Finally*, it is undisputed that the reasons for placing Plaintiff on a PIP and issuing the formal warning email were legitimately believed by Howard. Put another way, Plaintiff cannot put forward any evidence, other than her own speculation, that the PIP and the formal warning email were based on any illegitimate beliefs held by Howard. Specifically, Plaintiff's conduct jeopardized patient care as demonstrated by numerous complaints made to Howard about Plaintiff by La Clinica, physicians, residents, and her supervisors. Based on a plethora of information from numerous sources reported to Howard, the CCC determined that:

- Plaintiff had an "[inability] to demonstrate professional conduct and accountability." In support, the CCC cited that Plaintiff:
    - o repeatedly refused to complete her training and/or work assignments;
    - o failed to adequately oversee the interns;
    - o failed to demonstrate insight into her own behavior and triggers for professionalism lapses and use this information to be professional; and
    - o failed to demonstrate a satisfactory level of training and participation in the program because of excessive absenteeism. (SOMF ¶ 91).

- Plaintiff had demonstrated "[poor] decision making in the management of patients in the clinical setting." In support, the CCC cited that Plaintiff:
    - o Refused to care for her La Clinica patients;
    - o Cancelled numerous clinical sessions without regard for her patients' care. (SOMF ¶ 92).

- Plaintiff had an "[inability] to professionally, respectfully, and effectively communicate with team members." In support, the CCC stated that Plaintiff had communicated with the intern class in a bullying and intimidating manner. (SOMF ¶ 93).

- Plaintiff demonstrated an inability to develop relationships and effectively communicate with physicians, healthcare professionals, and healthcare teams as demonstrated by her bullying and harassing communications with the interns and a supervising physician at La Clinica. (SOMF ¶ 94).

- Plaintiff demonstrated a failure to understand the importance of the health care team and respect for skills and contributions of others, as demonstrated by her bullying and harassing communications with the interns. (SOMF ¶ 95).

- Plaintiff demonstrated an inability to communicate collaboratively with the health care team by listening attentively, sharing information, and giving and receiving constructive feedback. The CCC noted that Plaintiff had directed hostile and harassing conduct toward the interns, engaged with a physician at La Clinica in a threatening manner, and had consistently responded to constructive feedback from physicians in a hostile and threatening manner. (SOMF ¶ 96).

Simply put, placing the Plaintiff on a PIP and issuing the formal warning email was justified given the abundance of written concerns about Plaintiff's work performance.[14]

Merely because Plaintiff may subjectively disagree with the PIP or the formal warning email is not enough for a reasonable jury to conclude there was an inference of retaliation given the abundance of information relied on by Howard for placing Plaintiff on a PIP and issuing the warning letter. Plaintiff's bizarre and unsupported speculation that La Clinica, the residents, other physicians, the CCC, and her supervisors colluded against her does not give rise to an inference of retaliation.

At core, the record evidence clearly demonstrates that Plaintiff's actions consistently jeopardized patient care and thus any action taken by Howard to remediate Plaintiff's deficiencies

---

[14]     When numerous reasons are provided for an adverse action, a plaintiff must disprove each basis for the action. Hairston v. Boardman, 915 F. Supp. 2d 155, 161 (D.D.C. 2013), aff'd sub nom. Hairston v. Vance-Cooks, 773 F.3d 266 (D.C. Cir. 2014) ("To defeat a Title VII defendant's summary judgment motion, a plaintiff must demonstrate pretext as to all of the defendant's proffered neutral explanations, not just some of them."). Here, Plaintiff cannot disprove each basis for the PIP and the formal warning email.

23

were justified. No reasonable jury could find an inference of retaliation given the abundance of written concerns about Plaintiff's work performance from numerous sources.

**b.   Motion to Dismiss for Failure to Prosecute**

Dismissal pursuant to Rule 41(b) for a failure to prosecute is warranted where a plaintiff has failed to prosecute or to comply with the Federal Rules of Civil Procedure or any order of the Court. Fed. R. Civ. P. 41(b). The considerations relevant to the determination of a Rule 41(b) motion are similar to those applicable under Rule 37 where a party has failed to comply with discovery-related orders or rules. The Court must consider (1) the effect of a plaintiff's conduct on the court's docket; (2) whether the defendant has been prejudiced by the plaintiff's conduct, and (3) whether deterrence "is necessary to protect the integrity of the judicial system." Bristol Petroleum Corp. v. Harris, 901 F.2d 165, 167 (D.C. Cir. 1990) (affirming dismissal under Rule 41(b) after plaintiff failed to appear at a court-ordered status conference).

Here, Plaintiff is clearly no longer interested in pursuing this litigation. Plaintiff has utterly failed to respond to the Interrogatories, Requests for Production of Documents, and Requests for Admission of Fact that Howard propounded on May 4, 2020—more than 200 days ago. (SOMF ¶ 121). While counsel for Howard sent Plaintiff repeated good faith requests for her answers on August 6, 2020, August 28, 2020 and September 14, 2020 and consistently noticed Plaintiff that Howard intended to move to dismiss her lawsuit for a failure to prosecute under Rule 41 should she not respond to Howard's discovery (SOMF ¶¶ 121, 128, 129), in response, Plaintiff has affirmatively stated that she does not intend to participate in discovery. (SOMF ¶ 130). Indeed, Plaintiff stated that Howard's good faith efforts to obtain her discovery responses in the lawsuit she brought against Howard are "cruel and shameful [.]" (SOMF ¶ 131).

Plaintiff's refusal to participate in discovery and the case she brought effectively precludes Howard's counsel from conducting further discovery and defending itself in this action. As such, Plaintiff has caused delay to the Court and Howard by precluding discovery and prejudiced Howard both by denying discovery and forcing Howard to incur unnecessary expenses to address Plaintiff's inaction. Notably, the Court has broad authority to, alternatively, dismiss all of Plaintiff's remaining claims as a discovery sanction under Rule 37(b)(2), for failure to respond to Howard's written discovery requests.  See Fed. R. Civ. P. 37(b)(2) (giving courts authority to issue discovery sanctions including "dismissing the action or proceeding in whole or in part"); see also United States v. Proceeds of Drug Trafficking Transferred to Certain Foreign Bank Accounts, 252 F.R.D. 60, 63 (D.D.C. 2008) (dismissing plaintiff's claim because of plaintiff's "unwillingness to participate in discovery").

Finally, dismissal here is warranted to protect the integrity of the judicial system because parties to the process should be expected to make the necessary effort to comply with the rules of the Court. See James v. Nationstar Mortg. LLC, 323 F.R.D. 85, 86–87 (D.D.C. 2017) (dismissing for failure to prosecute where court had not heard from pro se plaintiffs for more than seven months); Allen v. United States, 277 F.R.D. 221, 224 (D.D.C. 2011) (dismissing for failure to prosecute where pro se plaintiff failed to respond to motion to dismiss); Stella v. Mineta, 231 F.R.D. 44, 48 (D.D.C. 2005) (dismissing Title VII claims under Rule 41 due to plaintiff's repeated delays and non-compliance with court's orders); Solomon v. Fairfax Vill. Condo. IV Unit Owner's Ass'n, 621 A.2d 378, 380 (D.C. 1993) (affirming dismissal for failure to prosecute where pro se plaintiff failed to file pretrial statement and failed to attend pretrial conference). Here, the Court has already warned Plaintiff of the need to comply with the applicable rules and that "[f]ailure to adhere to these rules or orders may result in sanctions, up to and including dismissal of this action."

(December 13, 2018 Court Order, Dkt. # 5). Given her admitted refusal to continue participating in this case, neither the Court nor Howard should be required to address her claims further.

## V.     <u>CONCLUSION</u>

For the above reasons, Howard respectfully requests that the instant Motion for Summary Judgment is granted. In the alternative, Howard requests that this matter be dismissed under Rule 41 for Plaintiff's failure to prosecute her case.

November 20, 2020                           Respectfully submitted,

**HOWARD UNIVERSITY**

_____/s/_____
Zachary I. Shapiro
Senior Associate General Counsel
D.C. Bar # 1021639
Nathiya Nagendra
Associate General Counsel
D.C. Bar #1031055
Howard University
2400 Sixth Street, N.W.
Washington, D.C. 20059
T: 202-806-2664
E-mail: zachary.shapiro@howard.edu
            nathiya.nagendra@howard.edu